# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

PFG ASPENWALK, LLC,

        Debtor.

Chapter 11

Case No. 10-47089-RJK

---

## DEBTOR'S DISCLOSURE STATEMENT

---

Dated: March 15, 2011

*/e/ Lara O. Glaesman*
Robert T. Kugler (# 0194116)
Lara O. Glaesman (# 0316866)
Adine S. Momoh (# 0390085)
**LEONARD, STREET AND DEINARD**
  *Professional Association*
150 South Fifth Street, Suite 2300
Minneapolis, Minnesota 55402
Telephone: (612) 335-1500
Facsimile:  (612) 335-1657

**ATTORNEYS FOR THE DEBTOR**

THIS IS NOT A SOLICITATION OF ACCEPTANCES OF THE CHAPTER 11 PLAN OF PFG ASPENWALK, LLC IN ITS CHAPTER 11 CASE. ACCEPTANCES MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL, BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT AND IS SUBJECT TO AMENDMENT PRIOR TO SUCH APPROVAL BEING GRANTED.

# TABLE OF CONTENTS

I. INTRODUCTION ...............................................................................................................1

   A. GENERAL .........................................................................................................................1
   B. CONFIRMATION HEARING AND VOTING PROCEDURES.................................................1
   C. REPRESENTATIONS ..........................................................................................................2
   D. RECOMMENDATION OF DEBTOR .....................................................................................2
   E. CONTACT INFORMATION .................................................................................................2

II. DISCLAIMER ..................................................................................................................3

III. DESCRIPTION OF THE DEBTOR...............................................................................4

   A. OWNERSHIP AND BUSINESS HISTORY OF THE DEBTOR .................................................4
   B. EVENTS LEADING TO CHAPTER 11 FILING .....................................................................5
   C. OPERATIONS AND EVENTS DURING THE BANKRUPTCY CASE.........................................7
   D. CREDITOR PAYMENTS ...................................................................................................10
   E. CREDITORS' COMMITTEE ..............................................................................................11

IV. RESERVATION OF ALL RIGHTS.............................................................................11

V. STEPS TAKEN BY THE DEBTOR TO IMPROVE OPERATIONS........................11

   A. OVERVIEW ....................................................................................................................11
   B. STABILIZATION OF EXPENSES AND PLAN GOING FORWARD .........................................11

VI. DESCRIPTION OF THE PLAN...................................................................................12

VII. PLAN TREATMENT OF UNCLASSIFIED CLAIMS AND INTERESTS ...............13

VIII. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS..............14

   A. CLASS I- CLAIMS SECURED IN WHOLE OR PART BY REAL ESTATE ...............................14
   B. CLASS II- UNSECURED PRIORITY CLAIMS ...................................................................16
   C. CLASS III- GENERAL UNSECURED CLAIMS-CONVENIENCE CLAIMS ...........................16
   D. CLASS IV- GENERAL UNSECURED CLAIMS ..................................................................16
   E. CLASS V- EQUITY INTERESTS.......................................................................................17

IX. EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND ADMINISTRATIVE CLAIMS ..18

X. MEANS OF EXECUTION OF THE PLAN .................................................................19

XI. ALTERNATIVES TO THE PLAN................................................................................19

XII. SUMMARY OF OTHER PROVISIONS OF THE PLAN ...........................................20

   A. RELEASE OF THE DEBTOR .............................................................................................20
   B. OWNERSHIP INTERESTS AND MANAGEMENT FOLLOWING CONFIRMATION OF THE PLAN...........20
   C. CLAIMS/TREATMENT OF DISPUTED CLAIMS ................................................................21
   D. RIGHTS OF ACTION .......................................................................................................21
   E. RETENTION OF JURISDICTION .......................................................................................22

XIII. RISKS RELATED TO THE PLAN..............................................................................23

XIV. ACCEPTANCE AND CONFIRMATION OF THE PLAN.........................................23

   A. BEST INTERESTS OF CREDITORS AND INTEREST HOLDERS ..........................................24
   B. SUMMARY OF TREATMENT OF CLASSES OF CREDITORS ..............................................24

7508068v1

| | | |
|---|---|---:|
| C. | FEASIBILITY ................................................................................................................ | 25 |
| D. | CONFIRMATION ........................................................................................................... | 25 |
| **XV.** | **CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** ............................... | **25** |
| A. | FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTOR: CANCELLATION OF INDEBTEDNESS AND REDUCTION OF ATTRIBUTES........................................................................................ | 26 |
| B. | FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CERTAIN CLAIMS ................................ | 27 |

7508068v1

## I.     INTRODUCTION

### A.     General

PFG AspenWalk, LLC (the "Debtor") seeks confirmation from the United States Bankruptcy Court for the District of Minnesota (the "Court") of its Plan of Reorganization (the "Plan").  A copy of the Plan accompanies this disclosure statement as **Exhibit A**.

This disclosure statement (the "Disclosure Statement") is furnished pursuant to § 1125 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, et seq. (the "Code"), and is intended to provide all of the Debtor's known holders of claims against or interests in the Debtor or its properties with information about the Debtor and the Plan sufficient to permit them to make an informed judgment about the Plan's merits and the decision to vote for acceptance or rejection of the Plan.  The information set forth in this Disclosure Statement has been supplied by the Debtor.

This Disclosure Statement, including the Plan, should be read in its entirety.  Additionally, it is suggested that it may be advisable for creditors and holders of interests to consult with their own counsel or other advisors with respect to matters contained herein.  For the convenience of creditors and holders of interests, the terms of the Plan are summarized in this Disclosure Statement in Sections VII and VIII.  However, the summary is qualified by the Plan itself, which is controlling in the event of any inconsistency.

Any capitalized terms contained herein which are not specifically defined herein shall have the meaning provided for in the Plan unless the context otherwise requires.

### B.     Confirmation Hearing and Voting Procedures

The Court has, in the order accompanying this Disclosure Statement, set a time and place for a hearing on the confirmation of the Plan.  Creditors and interest holders may vote for or against the Plan by completing, dating, and signing the enclosed ballot and sending by U.S. mail or otherwise delivering the ballot to the Clerk of United States Bankruptcy Court ("Clerk").  YOUR BALLOT MUST BE RECEIVED BY THE CLERK BY THE TIME AND DATE PROVIDED FOR IN THE COURT'S ORDER AND AS SET FORTH ON THE BALLOT FOR YOUR VOTE TO BE COUNTED.  Attached as **Exhibit B** are sample ballots for both claims and equity interests.

Pursuant to the Code, any holders of allowed claims (or claims which are deemed allowed) or interests are entitled to vote on the Plan.  Objections to claims and interests may be filed with the Court up to and including 30 days after the Confirmation Date or within such time as is fixed by the Court.  If an objection is filed after the Confirmation Date, the claim will be deemed allowed only for voting purposes prior to confirmation.

### C.     Representations

NO REPRESENTATIONS CONCERNING THE DEBTOR (PARTICULARLY AS TO ITS FUTURE BUSINESS OPERATIONS OR THE VALUE OF ITS PROPERTY) ARE AUTHORIZED BY DEBTOR OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT OR IN THE ATTACHED PLAN.  ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE ACCEPTANCE, OR REJECTION, OF THE PLAN WHICH ARE OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY CREDITORS OR HOLDERS OF INTERESTS IN ARRIVING AT A DECISION TO VOTE TO ACCEPT OR REJECT THE PLAN.  IT IS THE SOLE RESPONSIBILITY OF EACH PARTY TO REACH ITS OWN CONCLUSION AS TO WHETHER TO ACCEPT OR REJECT THE PLAN.

THE INFORMATION CONTAINED HEREIN, UNLESS OTHERWISE INDICATED, HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT.  FORMAL APPRAISALS HAVE NOT BEEN OBTAINED.  ALL STATEMENTS CONCERNING FINANCIAL DATA ARE MADE IN GOOD FAITH AND ARE INTENDED TO BE AS COMPLETE AND AS ACCURATE AS POSSIBLE WITHIN THESE LIMITATIONS.  THERE IS NO ASSURANCE THAT THE FIGURES SHOWN IN THE PROJECTIONS WILL BE ACHIEVED.  THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY, ALTHOUGH GREAT EFFORT HAS BEEN MADE TO BE ACCURATE.

RESULTS FOR INTERIM PERIODS ARE NOT NECESSARILY INDICATIVE OF RESULTS THAT WOULD BE OBTAINED FOR AN ENTIRE YEAR.  FURTHERMORE, SUCH STATEMENTS MAY NOT CONTAIN NORMAL YEAR END ACCRUALS OR ADJUSTMENTS.  UNLESS OTHERWISE STATED, THE INFORMATION CONTAINED HEREIN HAS BEEN PREPARED BY THE DEBTOR.

LEONARD, STREET AND DEINARD, COUNSEL FOR THE DEBTOR, HAS NOT VERIFIED ANY OF THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT.  NEITHER THE DEBTOR NOR LEONARD, STREET AND DEINARD HAVE ANY ACTUAL KNOWLEDGE OF ANY INACCURACIES.

### D.     Recommendation of Debtor

In the opinion of the Debtor, the Plan is the best available option for secured and unsecured creditors and holders of interests.  Based upon its examination of alternatives to the Plan, including liquidation, it is the Debtor's belief that none of the alternatives afford creditors or holders of interests as great a realization as does the Plan.

### E.     Contact Information

The principal office of the Debtor is located at 3208 W. Lake St. #5, Minneapolis, Minnesota 55416, and the telephone number is (612) 802-7022.

7508068v1

## II.     DISCLAIMER

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR THE PURPOSE OF SOLICITING ACCEPTANCES OF THE PLAN OF REORGANIZATION OF THE DEBTOR AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS AND INTEREST HOLDERS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETIES BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETIES BY REFERENCE TO THE PLAN.  SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS REFERRED TO IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE APPLICABLE AGREEMENT, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN SUCH AGREEMENT.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF MARCH 15, 2011 UNLESS ANOTHER TIME IS SPECIFIED HEREIN AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.  THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE MARCH 15, 2011.

TO BE COUNTED, BALLOTS MUST BE ACTUALLY RECEIVED IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON OR BEFORE THE VOTING DEADLINE.  PLEASE SEE SECTION I. B. OF THIS DISCLOSURE STATEMENT FOR THE VOTING INSTRUCTIONS.  BALLOTS WILL NOT BE ACCEPTED VIA FACSIMILE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(C) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW.  THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

7508068v1

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE REORGANIZATION AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN DEBTORS.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND BECOMES EFFECTIVE, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE WHO REJECTED OR WHO ARE DEEMED TO HAVE REJECTED OR ACCEPTED THE PLAN AND THOSE WHO DID NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN.

## III.  DESCRIPTION OF THE DEBTOR.

### A.  Ownership and Business History of the Debtor

The Debtor was formed on April 19, 2007, as a Delaware limited liability company. Its primary assets consist of the following: (i) real property located at 404 Park Avenue, Aspen, Pitkin County, Colorado (the "Rental Property") and the proceeds generated therefrom; (ii) the Debtor's rights under an Agreement to Buy and Sell Real Estate (the "Sale Agreement") dated June 26, 2006, for 414 Park Circle, Aspen, Pitkin County, Colorado; and (iii) a joint development agreement with the Aspen Pitkin County Housing Authority (the "Housing Authority") covering the development of the Rental Property and the 414 Park Circle, Aspen, Pitkin County, Colorado property (collectively, the "Development Property"). The Debtor purchased the Development Property in July 2007 with the intention of constructing a thirty-nine (39) unit condominium development, which was to be composed of fourteen (14) luxury units to be sold to the general public and twenty-five (25) work-force units to be sold to the Housing Authority (the "Project"). Pursuant to the Sale Agreement between the Debtor and the Housing Authority, the Debtor has an additional asset consisting of an agreement to purchase the parcel located at 414 Park Circle, Aspen, Colorado for $750,000. The Debtor's other assets consist of an account receivable in the amount of $4,580 from Petters Real Estate Group LLC, a Delaware limited liability company ("Petters Real Estate") and an insurance policy.

To finance the acquisition of the Development Property, obtain Project approvals, and to construct the Project, the Debtor used the proceeds of a loan (the "Bank of America Loan") from Bank of America, N.A. (as successor in interest to LaSalle Bank National Association, a national banking association, "Bank of America"). As a result of the Bank of America Loan, Bank of America obtained a security interest in and a lien on all of the Debtor's property related to or arising from the Development Property. Further, as part of the security granted to Bank of America, the Debtor executed, and Bank of America properly recorded, an Assignment of Rents in December 2007, whereby the Debtor sold, conveyed, and assigned to Bank of America all "rents, revenues, issues, profits, proceeds, receipts, income, accounts and other receivables"

4

arising out of or from the Rental Property (the "Rents"). The Debtor also used the proceeds of an approximately $6.5 million equity contribution (the "Petters Contribution") from Petters Real Estate and $5.4 million equity contribution from sixteen other investors. Businessman Thomas J. Petters ("Tom Petters") personally guaranteed the Bank of America Loan.

Before the Debtor could begin the Project, it had to obtain both Conceptual Planned Unit Development Approval ("Conceptual PUD Approval") and Final Planned Unit Development Approval ("Final PUD Approval") for the Project from the Aspen City Council. In or about October 2007, the Debtor submitted an application to the Aspen City Council requesting Conceptual PUD Approval for the Project.

### B. Events Leading to Chapter 11 Filing

On or about September 24, 2008, the Federal Bureau of Investigation, together with the Internal Revenue Service – Criminal Investigation Division and the United States Postal Inspection Services, based on claims of fraud and other wrongdoing by Tom Petters, his various companies, and his employee James Wehmhoff ("Wehmhoff") (along with others), publicly announced an investigation of Tom Petters, his companies, Wehmhoff and various other employees allegedly involved in a Ponzi scheme. On October 3, 2008, Tom Petters was arrested on charges of mail and wire fraud, money laundering and conspiracy. The United States alleged that Tom Petters defrauded more than 20 lenders and investment groups out of approximately $3 billion.

As a result of the investigation and arrest, numerous employees of Tom Petters' companies voluntarily terminated their employment, including the primary law firm providing overall corporate counsel, the two senior in-house counsel, Tom Petters' primary CEO and CFO, and others with knowledge of the financial transactions among Tom Petters, the companies, lenders, investors, and other creditors.

On October 6, 2008, in the case of *United States of America, et al, v. Thomas J. Petters, et al*, Case No. 08-CV-5348 (the "Case") in the United States District Court for the District of Minnesota, the Honorable Ann D. Montgomery, United States District Court Judge, appointed Douglas A. Kelley (the "Receiver") as receiver for all of Tom Petters' assets and companies, including the Debtor and all of Wehmhoff's assets.[1]

After the Receiver's appointment, the Receiver was in control of Petters Real Estate and the controlling ownership interest in the Debtor. Indeed, the Receiver assumed Tom Petters' previous role as manager of the Debtor. Moreover, Judge Montgomery issued an order staying all parties from commencing or continuing any action against Tom Petters or any of his affiliates, including Petters Real Estate and the Debtor. The Judge's order also effectively froze the Debtor's assets, as the Debtor was no longer able to make payments to any of its creditors, including Bank of America, without court approval. This put the Debtor and the Project in limbo for the foreseeable future.

---

[1] Tom Petters was later convicted on twenty counts of fraud, conspiracy and money laundering for orchestrating the $3 billion Ponzi scheme. He was sentenced to serve 50 years in prison for his crimes.

The City of Aspen Planning Commission had previously approved the Debtor's plans for the Project on May 20, 2008, and on October 27, 2008, the City of Aspen City Council gave its approval for the Project by passing Resolution No. 74, granting Conceptual PUD Approval for the Debtor's Project (the two approvals are collectively, the "Preliminary Governmental Approvals"). The Debtor's Conceptual PUD Approval for the Project was to expire on or about October 29, 2009. In or around September 2009, the Debtor submitted a request to the Aspen City Council for extension of the Conceptual PUD Approval. On or about October 13, 2009, the Aspen City Council granted the Debtor's request, extending Conceptual PUD Approval until October 28, 2010.

Due to Tom Petters' and Wehmhoff's criminal proceedings, the Aspen City Council later conditioned the Preliminary Governmental Approvals on the Debtor removing Tom Petters and Wehmhoff as owners and managers. This required the Debtor to divest Tom Petters, Wehmhoff and Petters Real Estate of their interests in the Development Property and Project while navigating around the limitations of the receivership order issued in the Case.

The Debtor's position worsened because Tom Petters' criminal proceedings constituted a default under the Bank of America Loan, which caused Bank of America to cease all funding to the Project construction and development. Thus, in order to proceed with the Project, the Debtor was required to (a) resolve the status of Tom Petters' and Wehmhoff's ownership interests, and (b) negotiate a resolution of the default with Bank of America in order to receive additional construction and development funding.

The default under the Bank of America Loan added numerous complications to the process. Bank of America, as the senior lien holder on the Development Property, had the power to approve or reject all proposals. Thus, each time the Debtor and the Receiver came to a consensus, the Debtor had to obtain Bank of America's approval. This only further delayed an already slow process. All the while, the Project remained on hold. The Debtor and its owners spent the next two years negotiating with the Receiver to purchase Tom Petters' interest in the Development Property and Project.

Eventually, the Receiver made a settlement proposal to Bank of America on March 11, 2010. Several months after settlement discussions began, on August 26, 2010, the Receiver and Bank of America entered into a settlement agreement (the "Settlement Agreement") whereby (a) Bank of America was granted relief from the stay in the Case and was permitted to commence foreclosure proceedings against the Rental Property; (b) Bank of America forgave, released, discharged and acquitted all amounts outstanding under and all security interests securing all loans to Tom Petters and Petters Real Estate; (c) the Receiver abandoned and relinquished all of Petters Real Estate's ownership interests in the Debtor; (d) the Receiver abandoned and relinquished all of Wehmhoff's ownership interests in the Debtor; and (e) the Receiver resigned as the manager of the Debtor.

The district court approved the Settlement Agreement pursuant to an order issued on September 22, 2010. As of that date, the Receiver was no longer an owner or manager of the

Debtor. Furthermore, on the same day, Thomas S. Hay was appointed Manager of the Debtor and Thomas Klassen and Thomas Salmen were appointed officers of the Debtor.

Notwithstanding the operations and revenue at the Rental Property and the Debtor's ability to continue developing the Project once Tom Petters and Wehmhoff were removed, Bank of America refused to resume funding under the Bank of America Loan. The lack of funding under the Bank of America Loan, therefore, threatened to destroy the Project unless the Debtor was permitted to restructure its debts and obligations under the Code. Accordingly, the Debtor filed a petition for relief pursuant to Chapter 11 of Title 11 of the Code on September 23, 2010 (the "Petition Date"), to seek debtor-in-possession financing from another source to continue developing the Project.

### C. Operations and Events During the Bankruptcy Case

#### Debtor-in-Possession Financing

In order to continue developing the Project and preserve the value of the Project, the Debtor sought debtor-in-possession financing ("DIP Financing") immediately following the bankruptcy filing. On September 29, 2010, the Bankruptcy Court entered an order authorizing the Debtor, on an interim basis, to obtain debtor-in-possession financing ("DIP Loan") from Rapid Funding, LLC (the "DIP Lender") and granting the DIP Lender a senior lien on the Development Property ("Priming Lien"). Additionally, the Bankruptcy Court (a) authorized the Debtor to draw $132,000 under the DIP Loan, (b) permitted the Debtor to grant Bank of America replacement liens in the Debtor's post-petition assets of the same type and nature as are subject to the pre-petition liens of Bank of America, (c) deemed the replacement lien granted by the Debtor to be properly perfected without further act or deed on the part of the Debtor or Bank of America, and (d) deemed Bank of America to be adequately protect with respect to its collateral.

On November 19, 2010, the Debtor and Bank of America entered into a stipulation with respect to the Debtor's authorization to obtain and make use of the DIP Financing. On November 24, 2010, the Bankruptcy Court entered another order authorizing the Debtor to obtain DIP Financing from the DIP Lender and to grant the DIP Lender a senior lien on the Development Property. Presently, the Debtor is in the process of negotiating another stipulation with Bank of America for continued use of the proceeds from the Debtor's DIP Loan and is working with Bank of America's counsel to finalize the budget for the Debtor's next draw of the DIP Financing. In the meantime, the Debtor will file its motion seeking court approval of the third draw on March 16, with a hearing scheduled for March 30, 2011. Since the Petition Date, the Debtor has been using the additional time and funding on the final governmental approval process and the Development Project's economics.

#### Conceptual and Final PUD Approvals

The Conceptual PUD Approval was set to expire on October 28, 2010. If that deadline passed without any further action by the Debtor, the Project would have had to be abandoned. Avoiding this result, the Debtor sought Final PUD Approval for the Project, which would allow

the development to continue. The Debtor, its creditors and other parties-in-interest were, therefore, required to proceed quickly to address the required final governmental approvals or the value of the Debtor's assets would seriously diminish in value.

As a result, on or about October 12, 2010, the Debtor filed an application with the City of Aspen seeking Final PUD Approval. On or about October 18, 2010, the City of Aspen confirmed that the Debtor's submittal package for application for Final PUD Approval was deemed complete. On February 15, 2011, the Debtor attended a hearing before the City of Aspen Planning and Zoning Commission ("Hearing") in relation to the Project. There are seven members and two alternates on the City of Aspen Planning and Zoning Commission ("Commission"). Due to scheduling conflicts, only four members of the Commission were able to meet for the Hearing. Of the four members of the Commission, two had been on the Commission at the conceptual stage of the Project in 2007 and two members are new to the Commission and the Project. At the beginning of the Hearing, the Community Development Department staff ("Department") recommended that it would like the Hearing continued to a second hearing date because it would like the Debtor to work on the following four areas in its Project proposal:

(i)     height variances (the current Department's interpretation of height variances is different from the original interpretation in 2007);

(ii)    livability of the affordable units (the Department would like improved outdoor spaces and some balconies);

(iii)   architectural detail (the Department prefers the draft of the contemporary building design sketch that was presented at the Hearing, instead of the classic mountain design, which is the design that has been developed since the date of conceptual approval) (at the conceptual approval, there were comments from the Department and the Aspen City Council ("City Council") that the classic mountain design presented too much bulk and mass and requested an option with less bulk and mass, which is the contemporary design); and

(iv)    parking allocation (the Department wants one parking unit (space) transferred from the free market unit to the affordable housing unit).

Following the Department's presentation at the Hearing, Stan Clauson, the Debtor's planning consultant, presented the Project to the Commission (the merits and its conformity with what was approved by the City Council at the conceptual approval hearings). After Clauson's presentation, the public had an opportunity to comment on the Project. During this time, one of the Board Members of the Housing Authority and the Director of the Housing Authority spoke out in strong support of the Project. Additionally, two individuals from adjacent condominium developments provided suggestions as to building features that would provide the most palatable alternative to their constituents. The Hearing closed with the four present Commission members unanimously voting to continue the Hearing to March 15, 2011, to enable the Debtor to examine and

implement as many of the suggestions from the Department's four recommended categories as it could into the Project design.

Currently, the Debtor is working with its architect to modify the Project design and architectural plans to incorporate the changes necessary to implement the Project into the contemporary design model. The Debtor anticipates that these modifications will be completed before March 15, 2011, in order to meet the Department's deadline in order that it can review the changes prior to the next Commission hearing. After the Commission hearing scheduled for March 15, 2011, the Debtor will participate in hearings before the City Council for Final PUD Approval. It is likely that the Final PUD Approval hearings will begin in April or May 2011, subject to the City Council's schedule, and conclude in May or June 2011.

### Adequate Assurance to Utilities Providers

On October 14, 2010, the Bankruptcy Court entered an order (i) prohibiting the Debtor's utility providers from altering, refusing or discontinuing certain utility services; and (ii) deeming those utility providers adequately assured of future performance once the Debtor made the requisite deposits to those utilities providers.

### Cash Collateral

Early in the bankruptcy case, the Debtor and Bank of America agreed to certain issues in connection with the use of cash collateral. In November 2010, the Debtor and Bank of America entered into a stipulation for the Debtor's use of Bank of America's cash collateral, which consists of rents, revenues, issues, profits, proceeds, receipts, income, accounts and other receivables arising out of or from the Debtor's property. The use of the cash collateral allows the Debtor to pay necessary operating expenses associated with the management and operation of the Rental Property and certain other allowed expenses in order to continue business operations related to the Project. The major components of the Debtor's adequate protection of Bank of America are:

- Bank of America is granted a valid, binding, enforceable and perfected lien in and on all real property and personal property of the Debtor and the Debtor's bankruptcy estate, whether now owned or hereafter acquired and wherever located, and all proceeds, rents and profits thereof.

- The liens granted by the November 2010 stipulation to Bank of America are subject only to the Priming Lien of Rapid Funding, Inc. on the Development Property, Project, and rents and any non-avoidable, valid, enforceable and perfected liens on or security interests in the assets of the Debtor, as a pre-petition debtor, which existed on the Petition Date, but only to the extent that such liens and security interests are superior in priority, to Bank of America's pre-petition liens and security interests in the assets of the Debtor, as a pre-petition debtor.

- Any pre-petition security interest or lien on the Debtor's property that is avoided or otherwise preserved for the benefit of the Debtor's bankruptcy estate under Bankruptcy Code § 551 or any other provision of the Bankruptcy Code shall be subordinate to the liens granted to Bank of America pursuant to this Stipulation.

## Single Asset Real Estate Case

On January 5, 2011, the Bankruptcy Court ordered that the Debtor's bankruptcy case constitutes a single asset real estate case as defined in 11 U.S.C. § 101(51B) of the Code, such that the Debtor is subject to 11 U.S.C. § 362(d)(3) of the Code. The Bankruptcy Court further ordered that (a) the Debtor file a plan and a proposed disclosure statement no later than March 15, 2011; (b) the Debtor obtain confirmation of a plan no later than August 1, 2011; and (c) the Debtor has the exclusive right to file a plan and a proposed disclosure statement until March 15, 2011.

On January 19, 2011 (and related to the Bankruptcy Court's Order of January 5, 2011), the Bankruptcy Court ordered that the Debtor may seek acceptance of a plan filed by March 15, 2011, without competing plans being filed until after May 15, 2011. In the event the Debtor, at any time prior to confirmation, amends any plan filed on or before March 15, the Court ordered that the Debtor's right to seek acceptance of any such amended plan without competing plans being filed until after May 15, 2011 shall be unaffected.

## Reduction of Expenses and Other Financial Results

Since the Petition Date, the Debtor has worked diligently to streamline its operation by focusing on cost-effective and efficient strategies. For instance, one example of the focus on efficiencies can be found in the Debtor's handling of the Project, including the selection of an efficient and cost-effective team of consultants, architects, and planners working diligently on obtaining Final PUD Approval. This team has remained unchanged since pre-petition. Another example can be found in the Debtor's rejection of the contract for consulting services with Sopris Consulting Group, LLC, which was approved by the Court on February 16, 2011. Also, on March 2, 2011, the Debtor filed an objection to the proof of claim of Sopris Consulting Group, LLC, which is scheduled for hearing on April 6, 2011.

### D. Creditor Payments

Debtor has made no payments to pre-petition creditors since the commencement of the Case. Additional information regarding Debtor's financial operations prior to filing its petition including a list of creditors and the amounts owed to each creditor, payments made to creditors in the 90 days prior to filing of the petition, payments to certain insiders in the one year prior to filing of the petition, is set forth in Debtor's Schedules and Statement of Financial Affairs which may be reviewed on the Court's website at www.mnb.uscourts.gov.

7508068v1

### E. Creditors' Committee

No Creditors' Committee has been appointed in the Case.

## IV. RESERVATION OF ALL RIGHTS

Post-confirmation, the Debtor shall retain the right to investigate the rights of recovery, if any, under the Bankruptcy Code, including preference actions and the like. Furthermore, the Debtor shall retain the right to commence adversary proceedings, object to claims, or take any other legal action allowed by the Bankruptcy Code, or other applicable law. All funds recovered from such proceedings will be given by the Debtor, or a third-party agent of the Debtor, to fund the Plan.

## V. STEPS TAKEN BY THE DEBTOR TO IMPROVE OPERATIONS

### A. Overview

The Debtor's primary response to the financial crisis it found itself in was to utilize the Chapter 11 process. In addition, the Debtor has:

(i) Reduced management staffing and executive compensation (relative to the amount of staffing in place and compensation paid before the receivership);

(ii) Obtained DIP Financing to continue funding the Project in order to position the Debtor to complete the Final PUD Approval process;

(iii) Obtained the use of Bank of America's cash collateral to fund operating expenses for the Rental Property;

(iv) Rejected the consulting contract with Sopris Consulting Group, LLC; and

(v) Objected to the unsecured proof of claim of Sopris Consulting Group, LLC.

These steps have allowed the Debtor to minimize expenses and maximize the Debtor's cash in order to meet and pay current operating expenses, move forward toward the completion of the Final PUD Approval process for the Project, market the Project for sale, and pay pre-petition secured and unsecured creditors under a Plan of Reorganization.

### B. Stabilization of Expenses and Plan Going Forward

Prior to the Petition Date, the Debtor was controlled by the Receiver and the PUD Approval process was stalled. During the receivership, all of the Debtor's assets were frozen and no steps were made to minimize expenses or move forward with the Preliminary Government Approvals to prepare the Project for development and/or sale. Further, tax payments and other expenses were occasionally paid late, resulting in interest charges. Since the Petition Date, the Debtor has taken many steps, detailed above in Section V.A, to minimize expenses and maximize the Debtor's cash, while moving forward to seek the Final PUD Approval as.

## VI. DESCRIPTION OF THE PLAN

THE DEBTOR HAS NEGOTIATED AND DEVELOPED ITS PLAN ON A BASIS SO AS TO PROVIDE REALISTIC AND ACCEPTABLE RECOVERIES TO EACH CLASS OF CREDITORS AND HOLDERS OF INTERESTS. THE DEBTOR BELIEVES THAT THE PLAN PERMITS THE MAXIMUM POSSIBLE RECOVERY FOR CREDITORS WHILE EXPEDITING THE REORGANIZATION OF THE DEBTOR. THE FOLLOWING DESCRIPTION OF THE PLAN IS QUALIFIED IN ITS ENTIRETY BY THE TERMS OF THE PLAN ITSELF WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT. THE DEFINITIONS IN THE PLAN APPLY EQUALLY TO THIS DISCLOSURE STATEMENT.

The Debtor's Plan will be funded by obtaining new financing after the Debtor obtains Final PUD Approval in the approximate amount of $9,000,000 ("New Financing"). The Debtor has received a Letter of Interest from Kennedy Funding, Inc. for the New Financing, wherein the potential lender has proposed a $9,000,000 loan subject to, among other things, fifty-five percent (55%) loan to market value as determined by an appraiser chosen by the potential lender.[2] Additionally, the Debtor is exploring interest from other lenders and expects to receive other competitive bids for New Financing. Following the closing of the New Financing, there will be sufficient cash generated for the benefit of the Debtor's estate so that the Debtor will be able to pay all of the allowed claims of its secured and unsecured creditors in full, as depicted in Section VIII.

Upon the Effective Date of the Plan, the current management of the Debtor will continue controlling the Debtor's affairs and all of the Debtor's Assets and will disburse funds and carry-out most of the provisions of the Plan, and remain in control of the bankruptcy-related matters of the Debtor's estate. Specifically, the Debtor will continue examining claims for determination as to allowed claim amounts and pursue claim objections and pursue adversary proceedings, including but not limited to any preference actions, actions to subordinate claims, and fraudulent transfer claims.

The Debtor believes that the Debtor's creditors will receive more from the performance of the Plan than by liquidating the Company. Creditors holding Secured Claims will receive the full amount of their Allowed Secured Claims, with interest. Creditors without security interests, who would likely receive nothing from a liquidation of the company, have, under the Plan, a vested interest in the survival of the Debtor, and will receive 100% of their allowed claims without interest.

The Debtor believes that the Plan enables each class of claims to maximize its recovery and, at the same time, allows the Debtor a method to be reorganized. The following description of the Plan is qualified by the terms of the Plan itself. Creditors should read both the Disclosure Statement and the Plan carefully and seek competent advice for any questions they may have.

---

[2] A copy of the Kennedy Funding, Inc. Letter of Interest is available upon request.

7508068v1

## VII.   PLAN TREATMENT OF UNCLASSIFIED CLAIMS AND INTERESTS

Unclassified Claims include:

(a)    All fees payable, including quarterly fees payable to the United States Trustee and any court fees, as required under 28 U.S.C. § 1930(a)(6).  As of the date hereof, these fees are current.

(b)    Post-petition Claims, incurred in the ordinary course of the Debtor's business other than those listed in paragraph c and d below.  These post-petition payments are current.

(c)    Allowed Priority Expense Claims, except as otherwise classified herein, including:

(1)    Allowed administrative expense fees and expenses of counsel for the Debtor pursuant to 11 U.S.C. § 503(b), as well as any other professionals hired by the Debtor and whose retention and fees have been or will be approved by the Court.

(2)    Administrative Claims of taxing authorities for post-petition taxes under 11 U.S.C. § 507(a)(2) and 503(b).  The post-petition taxes are current.

(3)    Claims of taxing authorities for pre-petition taxes entitled to priority by reason of 11 U.S.C. § 507(a)(8).

Treatment of Administrative Priority Claims:

The Debtor shall pay each holder of the foregoing Allowed Administrative Claims the full amount of such Allowed Administrative Claim (a) in cash on the Effective Date, or as soon as practicable thereafter, but no later than thirty (30) business days after the Effective Date, or (b) in accordance with such terms to which Debtor and the holder of such Allowed Administrative Claim may agree in writing; provided, however, that (i) Allowed Administrative Claims related to executory contracts and unexpired leases shall not be paid prior to the date on which such contracts and leases are actually assumed pursuant to Section IX of the Plan and (ii) Allowed Administrative Claims with respect to liabilities incurred by Debtor in the ordinary course of business during the Chapter 11 Case shall, at the option of Debtor, be paid in the ordinary course of business in accordance with their terms.  Allowed Administrative Claims related to executory contracts and unexpired leases shall be paid in accordance with their original terms or such different terms to which Debtor and the holders of such claims may agree.

The Debtor will continue to pay all fees payable, including quarterly trustee fees, and any other court fees, that come due until the Chapter 11 case is closed, converted or dismissed, as required by 28 U.S.C. § 1930, but subject to any amendments to the Bankruptcy Code made retroactively applicable to this case.  After confirmation of the Plan, the Debtor will submit quarterly operating reports to the United States Trustee, in the format prescribed by the United

7508068v1

States Trustee until the case is closed, dismissed or converted and to pay such Administrative Claims to the Office of the United States Trustee as described in the Bankruptcy Code and Rules.

Treatment of Non-Administrative Priority Claims:

The Debtor shall pay all Allowed Priority Claims under § 507(a)(2)-(7), if any, in full on the Effective Date, or as soon as practicable thereafter, or shall be paid in accordance with such terms as may have been or may be agreed upon by Debtor and the respective claimants. The Debtor estimates that there are no claimants holding Allowed Priority Claims under § 507(a)(2)-(7).

Allowed claims arising under § 507(a)(8) will, unless otherwise agreed, receive payment in full satisfaction of their claims term notes in principal amounts equal to the Allowed Claims payable, with interest at the rate set for Current Mid Term AFRs for instruments having a term in excess of three (3) years but no greater than (9) years published by the U.S. Internal Revenue Service for the most recent month available prior to the Effective Date. Such term notes will be payable in monthly cash installments sufficient to fully amortize such claims over terms not exceeding five (5) years after the Effective Date. At this time, no claims have been filed that are entitled to priority payment under § 507(a)(8), and the Debtor is not aware of any such outstanding claims.

The following professionals have been approved by the Court: (i) Leonard, Street and Deinard, counsel for the Debtor; and (ii) Garfield & Hecht, P.C., special counsel for the Debtor. Other professionals may be employed only after court approval during the administration of this case. The Debtor estimates that the total outstanding administrative claims arising from attorneys' fees and costs incurred in connection with this Chapter 11 proceeding will be approximately $100,000.00. The Debtor estimates that the total outstanding administrative claims arising from the payments to the developer overhead for the Project will be $30,000.00. The payment of such amounts will be paid on the Effective Date.

## VIII.   CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

The following is a summary of the classification of claims and interests and the treatment of those claims and interests under the Plan:

### A.        Class I- Claims Secured in Whole or Part by Real Estate

#### 1.        Class I A: Secured Claim of Rapid Funding, LLC

Description:

The Class I A Claim shall consist of the Secured Allowed Claim held by Rapid Funding, LLC ("Rapid Funding"), in the amount of approximately $540,000.00, plus whatever the Debtor gets in the next DIP draw, up to $585,000.00, (inclusive of interest) or such other amount as shall be agreed upon by Debtor and Rapid Funding or determined by the Court to be secured pursuant to § 506 of the Code. The Class I A Claim consists of the remaining unpaid principal balance of

secured loans from Rapid Funding to Debtor plus accrued but unpaid interest as of the Effective Date.  As of the date the Disclosure Statement was prepared, the Debtor was indebted to Rapid Funding as follows:

| | $540,000, plus whatever the Debtor gets in the next DIP draw, up to $585,000 |
|---|---|
| Rapid Funding Claim under the Note (including principal and interest) | |
| TOTAL | $1,125,000 |

Treatment:

The Debtor proposes to pay $540,000.00, plus whatever the Debtor gets in the next DIP draw, up to $585,000.00, plus any allowed additional attorneys fees as a secured claim to Rapid Funding on the Effective Date.  In exchange for receiving payment in full of its Class I A Claim, on or before the Effective Date, Rapid Funding shall execute all necessary documents to release its mortgage(s) and liens and security interests in the assets of the Debtor.  The holder of the Class I A Claim is deemed unimpaired under the Plan.

## 2.     Class I B: Secured Claims of Bank of America

Description:

The Class I B Claim shall consist of the Secured Allowed Claim held by Bank of America in the amount of approximately $6,488,884.77 or such other amount as shall be agreed upon by Debtor and Bank of America or determined by the Court to be secured pursuant to § 506 of the Code.  The Class I B Claim consists of the remaining unpaid principal balance of secured loans  from Bank of America to Debtor plus accrued but unpaid interest and real estate taxes as of the Effective Date.  As of the Petition Date, the Debtor was indebted to Bank of America as follows:

| Bank of America Claim under the Note (including principal and interest) | $6,488,884.77 |
|---|---|
| TOTAL[3] | $6,448,884.77 |

Treatment:

The Debtor proposes to pay $6,488,884.77, plus any allowed additional attorneys fees as a secured claim to Bank of America on the Effective Date.  In exchange for receiving payment in full of its Class I B Claim, on or before the Effective Date, Bank of America shall execute all necessary documents to release its mortgage(s) and liens and security interests in the assets of the Debtor.  The holder of the Class I B Claim is deemed unimpaired under the Plan.

---

[3] As an oversecured creditor, Bank of America is also entitled to an unspecified amount of reasonable attorney's fees for post-petition services.  The Debtor reserves the right to object to the awarding of these additional fees in whole or in part.

### B. Class II- Unsecured Priority Claims

Description:

This class shall consist of Allowed Unsecured Priority Claims for tenant security deposits and prepaid rent to tenants of the Rental Property.

Treatment:

The holders of Class II Allowed Claims will be paid a total of 100% of their claims on the Effective Date. Such payments shall be in full satisfaction of each Allowed Unsecured Claim Priority Claim. The Debtor estimates that there are eleven (11) claims totaling approximately $18,400.00 in claims in Class II.

### C. Class III- General Unsecured Claims-Convenience Claims

Description:

This class shall consist of Allowed Unsecured Claims not entitled to priority where the total of the allowed claim does not exceed $500.00. Any unsecured creditor whose claim exceeds $500.00 may elect this treatment by voting in the Plan to be treated as a Class III creditor by electing to reduce the creditor's total claim to $500.00. The holders of Class III claims shall be paid their Allowed Claims as follows:

Treatment:

The holders of Class III Allowed Claims will be paid a total of 100% of their claims on the Effective Date. Such payments shall be in full satisfaction of each Allowed Unsecured Claim. The Debtor estimates that there are seven (7) claims totaling approximately $2,548.52 in claims in Class III.

### D. Class IV- General Unsecured Claims

Description:

This class shall consist of Allowed Unsecured Claims not entitled to priority and not treated in any other class in the Plan, including the unsecured portion of any secured claim. The total unsecured debt (either as scheduled by the debtor or pursuant to allowed proofs of claims) is approximately $1,108,751.41. The Debtor estimates that there are two (2) creditors in Class IV. The holders of general unsecured claims shall be paid their Allowed Claims over time, and treated as follows:

Treatment:

The holders of Class IV Allowed Claims will be paid their Allowed Claims on the Effective Date or the date the Court enters an order allowing the Class IV claim, whichever is

later. Such payments shall be in full satisfaction of each Allowed Unsecured Claim. The Debtor estimates that there is approximately $1,108,751.41 of debt in the unsecured Class IV Claims, not including objectionable claims. The Debtor estimates that there are two (2) creditors in Class IV.

The holders of the Class IV Claims are deemed unimpaired under the Plan.

E.    **Class V- Equity Interests**

This class shall consist of the allowed ownership interests of the Debtor by its Common Unit Holders and Series A Preferred Unit Holders as follows:

| Current Capitalization | | | |
|---|---|---|---|
| *Common Unit Holders* | *Units* | *% of Common* | *Capital Contribution* |
| Thomas Hay (President) | 225,000 | 69.2% | $807,326 |
| Thomas Klassen (VP Operations) | 50,000 | 15.4% | $89,703 |
| Thomas Salmen (VP Finance) | 50,000 | 15.4% | $89,703 |
| **Common Unit Total =** | 325,000 | 100.0% | $986,732 |
| | | | |
| *Series A Preferred Unit Holders (Non-voting)* | *Units* | *% of Srs A Pref* | *Capital Contribution* |
| Falcon Partners, LTD. | 550,000 | 14.7% | $550,000 |
| Patricia A. Hamm | 100,000 | 2.7% | $100,000 |
| Graham O. King Family, LLC | 500,000 | 13.3% | $500,000 |
| Jedco Properties, LLC | 500,000 | 13.3% | $500,000 |
| Mary L. Jeffries | 50,000 | 1.3% | $50,000 |
| Lancer Partners, LLC | 500,000 | 13.3% | $500,000 |
| Jane K. Mauer | 250,000 | 6.7% | $250,000 |
| Mark Laumann | 25,000 | 0.7% | $25,000 |
| Ark Royal Aspen Realty, LLC | 975,000 | 26.0% | $975,000 |
| Sun Investments, LLC | 300,000 | 8.0% | $300,000 |
| **Series A Preferred Unit Total =** | 3,750,000 | 100.0% | $3,750,000 |
| | | | |
| **TOTAL =** | | | $4,736,732 |

The holders of Class V Interests shall retain their respective interests (except that any outstanding warrants, options, or other rates, commitments, or agreements of any nature, if any, to require additional membership interests of Debtor are cancelled and terminated). All holders of Class V Interests shall execute a membership interest agreement generally requiring them to exercise their rights and powers as owners of membership interest to execute the terms of this Plan.

The Class V interests are deemed impaired under this plan.

<u>Treatment</u>:

All Common Unit Holders and Series A Preferred Unit Holders shall receive a pro rata distribution pursuant to the terms of the Membership Agreement and after the Effective Date, will receive the same percentage of ownership in the reorganized debtor and the Common Unit Holders and Series A Preferred Unit Holders will remain as owners of the Debtor, as diluted by the ownership interests awarded Class V Claimants as follows:

| Capitalization after Dilution | | | |
|---|---|---|---|
| *Common Unit Holders* | *Units* | *% of Ownership* | *Capital Contribution* |
| Thomas Hay (President) | 161,917 | 16.2% | $807,326 |
| Thomas Klassen (VP Operations) | 17,991 | 1.8% | $89,703 |
| Thomas Salmen (VP Finance) | 17,991 | 1.8% | $89,703 |
| Falcon Partners, LTD. | 110,308 | 11.0% | $550,000 |
| Patricia Hamm | 20,056 | 2.0% | $100,000 |
| Graham O. King Family, LLC | 100,280 | 10.0% | $500,000 |
| Jedco Properties, LLC | 100,280 | 10.0% | $500,000 |
| Mary Jeffries | 10,028 | 1.0% | $50,000 |
| Lancer Partners, LLC | 100,280 | 10.0% | $500,000 |
| Jane Mauer | 50,140 | 5.0% | $250,000 |
| Mark Laumann | 5,014 | 0.5% | $25,000 |
| Ark Royal Aspen Realty, LLC | 195,546 | 19.6% | $975,000 |
| Sun Investments, LLC | 60,168 | 6.0% | $300,000 |
| Rapid Funding, LLC | 50,000 | 5.0% | |
| **Total =** | 1,000,000 | 100.0% | $4,736,732 |

The holders of Class V Interests shall retain their respective interests (except that any outstanding warrants, options, or other rates, commitments, or agreements of any nature, if any, to require additional membership interests of Debtor are cancelled and terminated). All holders of Class V Interests shall execute a membership interest agreement generally requiring them to exercise their rights and powers as owners of membership interest to execute the terms of this Plan.

## IX.    EXECUTORY    CONTRACTS    AND    UNEXPIRED    LEASES    AND ADMINISTRATIVE CLAIMS

Attached as **Exhibit D** is a list of the executory contracts and leases to which the Debtor is a party. As to each such contract or lease, the exhibit indicates whether the Debtor has assumed the contract or lease, entered into a new or replacement contract or lease, or has or intends to reject or assume the contract or lease pursuant to this Plan. The Debtor may file any amendments to the list of contracts or leases it intends to reject, assume, or assume and assign up until twenty (20) days prior to confirmation of the Plan. If any executory contracts or leases are

not listed on Exhibit D, said contract or lease shall be deemed rejected, if not previously rejected, as of the Confirmation Date.

Unless otherwise ordered by the Court, a party to a rejected contract or lease under the Plan shall have (thirty) 30 days following the Confirmation Date to file a proof of claim for any damages incurred because of the rejection, if any. The Debtor shall, thereafter, have twenty (20) days to file an objection to any such proofs of claim.

Unless otherwise ordered by the Court, any party holding an Administrative Claim, which has received a copy of this Plan, shall have thirty (30) days following the confirmation date to file a request for payment of administrative expenses pursuant to the applicable provisions of the Bankruptcy Code and Rules. Failure to file such a request in a timely manner shall be deemed a waiver of the claim and the Debtor shall not be obligated to pay such claim.

## X.      MEANS OF EXECUTION OF THE PLAN

The Debtor's Plan will be funded by obtaining New Financing. The Debtor has received a Letter of Interest from Kennedy Funding, Inc. for the New Financing, wherein the potential lender has proposed a $9,000,000 loan subject to, among other things, fifty-five percent (55%) loan to market value as determined by an appraiser chosen by the potential lender. Additionally, the Debtor is exploring interest from other lenders and expects to receive other competitive bids for New Financing. Following the closing of the New Financing, there will be sufficient cash generated for the benefit of the Debtor's estate so that the Debtor will be able to pay all of the allowed claims of its secured and unsecured creditors in full, as depicted in Section VIII.

The Debtor's management team, after confirmation, will manage its affairs and disburse funds, serving as required as disbursing agent. The Debtor will provide or pay out of operating funds for all of its administrative expenses and business debts in the ordinary course of business, according to the Plan.

Attached to this Disclosure Statement and marked as **Exhibit E** are projections prepared by the Debtor.

## XI.      ALTERNATIVES TO THE PLAN

In proposing this Plan, various alternatives to the Plan have been considered and evaluated by the Debtor, including sale of the Debtor and liquidation under Chapter 7 of the Bankruptcy Code. The Debtor considered these and other alternatives, and is convinced that the Plan, in comparison, provides a greater recovery to creditors on a more expeditious time table than the alternatives.

If the Debtor's Plan, or any other Chapter 11 plan cannot be confirmed, the Chapter 11 case may be converted to a case under Chapter 7 of the Bankruptcy Code, in which a trustee would be appointed to liquidate the assets of Debtor. The Debtor's estimate of the effect that a Chapter 7 liquidation would have on recovery to holders of claims and interest is set forth in the Liquidation Analysis attached to this Disclosure Statement as **Exhibit F**. If a trustee is appointed

and the remaining assets of the Debtor are liquidated under Chapter 7 of the Bankruptcy Code, the Debtor believes that creditors holding general unsecured claims will receive distributions of a lesser value on account of their allowed claims.

The Debtor believes strongly that acceptance of the Plan is in the best interest of the Debtor's creditors. Based upon the financial projections discussed above, the Debtor believes it can offer more to unsecured claimants than under a liquidation scenario, in which the Debtor's assets are returned to the primary secured creditors, and other priority claimants. If liquidation were to occur, only secured claimants would receive anything and unsecured creditors would receive nothing as illustrated in the Liquidation Analysis. *See* Exhibit F.

## XII. SUMMARY OF OTHER PROVISIONS OF THE PLAN

### A. Release of the Debtor

As of the Effective Date, the rights afforded in the Plan shall be in exchange for and in complete settlement, satisfaction, payment, cancellation, discharge and release of all Claims of any nature whatsoever against the Debtor or any of its assets or properties or its interests therein, and all holders of Claims or Interests shall be precluded from asserting against the Debtor, its assets or properties, any other or further claims or administrative actions based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Confirmation Date. Provided, however, that such release shall not be effective as to any obligation of the Debtor under an executory contract or unexpired lease, unless and until such lease or contract is rejected as provided under the Plan. The discharge of the Debtor shall be effective as to each Claim or Interest regardless of whether a proof of claim was filed, whether the Claim is an Allowed Claim or whether the holder thereof votes to accept the Plan. Nothing in the Plan or this Disclosure Statement is intended to act as a release of any party other than the Debtor and the Debtor-in-possession.

### B. Ownership Interests and Management Following Confirmation of the Plan

On the Effective Date, the Common Unit Holders and Series A Preferred Unit Holders will be the total of the Class V claimants (see above). On the Effective Date, the management of the reorganized debtor will be the same as the management of the Debtor. Specifically, the current managers and executive officers of Debtor will continue to be employed by the Debtor after confirmation of the Plan and will receive $150,000.00 as a restructuring consultation fee to be paid after the Effective Date:

| Name | Position(s) With Debtor |
|------|------|
| Thomas S. Hay | President |
| Thomas H. Klassen | Vice President of Operations |
| Thomas Salmen | Vice President of Finance |

The Debtor is not aware of any violation of fiduciary duties by officers or governors of the Debtor. The Debtor has no current plans to make any other changes in its management structure or personnel.

7508068v1

C.    **Claims/Treatment of Disputed Claims**

1.    **Bar Date; Disputed Claims.**

The Court has established January 31, 2011, as the last date for the Debtor's creditors to file a proof of claim.  The last date for governmental units to file a proof of claim is March 22, 2011.  As of the date of this Disclosure Statement, three (3) proofs of claim have been filed, totaling approximately $7,672,431.95.

No cash or property shall be distributed under the Plan on account of any Disputed Claims or portion thereof until such Disputed Claim becomes an Allowed Claim.  At such time as a Disputed Claim is resolved and becomes an Allowed Claim, the holder thereof will receive, as soon as practicable thereafter, the distributions to which such holder is then entitled under the Plan.

As of the Effective Date, the Debtor shall have the exclusive right to make and file objections to claims, which objections shall be filed within such periods and in such manner as is provided for in the Rules of Bankruptcy Procedure, local rules or pursuant to the court's orders.

2.    **Unasserted and Contingent Liabilities.**

It is believed there are no unasserted or contingent liabilities.

D.    **Rights of Action**

1.    **Avoidance Actions.**

Under the Bankruptcy Code, a Debtor may seek to recover, through adversary proceedings in the Bankruptcy Court, certain transfers of Debtor's property made during the ninety (90) days immediately preceding the bankruptcy filing (or in the case of a transfer to an insider, one year preceding the bankruptcy filing) with respect to antecedent debts to the extent the transfer results in the transferee receiving more than it would have received on account of such debt had the Debtor been liquidated under Chapter 7 of the Bankruptcy Code.  There are certain defenses to a preference action, principally for payments made for equivalent new value and payments made in the ordinary course of business.  The statute of limitations for the commencement of preference and other avoidance actions is two years from the preference date.

While the Debtor is undertaking a review of potential preference and other avoidance actions, the Debtor does not believe that there are substantial preference or avoidance actions which would result in meaningful recovery for the estate.

2.    **Other Actions.**

Unless a claim or cause of action against a creditor or other entity is expressly waived, relinquished, released, compromised or settled in the Plan, the Debtor expressly reserves such claim or cause of action and the right to pursue the same.

7508068v1

### E. Retention of Jurisdiction

Following confirmation of the Plan, the Court shall retain jurisdiction to the maximum extent legally permissible, including, for the following specific purposes:

(a)     to modify this Plan after confirmation, pursuant to the Code;

(b)     to correct any defect, cure any omission or reconcile any inconsistency in this Plan or the Confirmation Order as may be necessary to carry out the purposes and intent of this Plan, including the adjustment of the date(s) of performance under this Plan and any documents related thereto so that the intended effect of this Plan and such other documents may be substantially realized thereby;

(c)     to enforce and interpret the terms and conditions of this Plan;

(d)     to enter such orders including, but not limited to, injunctions as are necessary to enforce the title, rights and powers of the Debtor;

(e)     to hear and determine any motions or contested matters involving taxes, tax refunds, tax attributes, tax benefits and similar or related matters with respect to the Debtor, or its estate arising prior to the Effective Date or relating to the period of administration of the Chapter 11 Case;

(f)     to hear and determine all applications for compensation of professionals and reimbursement of expenses under Sections 330, 331 or 503(b) of the Code;

(g)     to hear and determine any causes of action arising during the period from the date a petition is filed through the Effective Date, or in any way related to this Plan or the transactions contemplated hereby, against the Debtor's, their respective officers, directors, members, attorneys, financial advisors, representatives and agents;

(h)     to determine any and all motions pending on confirmation for the rejection, assumption or assignment of executory contracts or unexpired leases and the allowance of any claim resulting therefrom;

(i)     to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(j)     to consider and act on the compromise and settlement of any claim against the interest in the Debtor or its estate;

(k)     to determine all questions and disputes regarding title to the assets of the Debtor or its estate;

(l)     to enter such orders as are necessary to implement and enforce any other orders entered in the Chapter 11 Case; and

(m)     to hear and determine any other matters related hereto and not inconsistent with the Code.

## XIII.   RISKS RELATED TO THE PLAN

Certain assumptions were made by the Debtor in connection with the projections upon which the Debtor's Plan, and its ability to fund the payments called for under the Plan.  Such assumptions involve certain risks and uncertainties that could cause actual results to differ materially from such projection.  These potential risks and uncertainties include, among other factors, the volatile nature of the financial markets, dependence on and competition for experienced personnel, successful implementation of our long-range strategy, and state and local regulatory and legislative changes.

The projections and liquidation analysis included in this Disclosure Statement are based upon a number of estimates and assumptions which, though considered reasonable when taken as a whole by the Debtor, are inherently subject to significant business, economic and competitive uncertainties and contingencies, many of which are beyond the control of the Debtor, and are based upon specific assumptions with respect to future business decisions, a number of which may change.  The projections are speculative in nature, and it can be expected that one or more of the assumptions in the projections may not materialize or will very significantly from actual results.

The success of the Plan depends almost entirely on the ability of the Debtor to obtain Final PUD Approval for the Development Property and then refinance the Development Property as described in this Disclosure Statement.

## XIV.   ACCEPTANCE AND CONFIRMATION OF THE PLAN

In order to confirm the Plan, the Code requires that the Court make a series of determinations concerning the Plan, including, among other things, that:

(1)     that the Plan has classified Claims in a permissible manner;

(2)     the contents of the Plan comply with the technical requirements of Chapter 11 of the Code;

(3)     Debtor has proposed the Plan in good faith; and

(4)     Debtor's disclosures concerning the Plan have been adequate and have included information concerning all payments made or promised in connection with the Plan and the Chapter 11 case, as well as the identity, affiliations and compensation to be paid to all insiders, if any.

Debtor believes that all of these conditions have been met and will seek rulings of the Court to this effect at the hearing on confirmation of the Plan.

The Code also requires that the Plan be accepted by requisite votes of creditors and holders of interests, that the Plan be feasible, and that confirmation of the Plan be in the "best interests" of all creditors and interest holders. To confirm the Plan, the Court must find that all of these conditions are met. Thus, even if the creditors and interest holders of Debtor accept the Plan by the requisite votes, the Court must make independent findings respecting the feasibility of the Plan, and whether it is in the best interests of Debtor's creditors and interest holders before it may confirm the Plan. The "best interests" and feasibility conditions to confirmation are discussed below.

### A. Best Interests of Creditors and Interest Holders

The "best interests" test requires that the Court find that the Plan provide to each member of each impaired Class of Claims a recovery which has a present value at least equal to the present value of the distribution which each such person would receive from the Debtor if the Debtor was liquidated under Chapter 7 of the Code. In such a Chapter 7 liquidation, the value realized by creditors would be reduced by the cost of such liquidation, including costs incurred during the Chapter 11 case and allowed under Chapter 7 of the Bankruptcy Code (such as professional fees and expenses), the trustee's fees, and the fees and expenses of professionals retained by the trustee. The potential Chapter 7 liquidation distribution must be further reduced by cost imposed by delay caused by conversion to Chapter 7. The net present value of a hypothetical Chapter 7 liquidation distribution is then compared to the recovery provided for creditors in the Plan.

See Exhibit F for the Debtor's Liquidation Analysis. While the Debtor has used its best efforts at arriving at an estimated liquidation value for its assets, the Debtor believes that such assets may still be overstated. Based on that analysis it is the Debtor's opinion that confirmation of the Plan is in the best interests of creditors.

### B. Summary of Treatment of Classes of Creditors

The following is a chart summarizing treatment of classes under the Plan:

| Class | Amount of Claim | Payment Under the Plan | Payment in Liquidation |
|---|---|---|---|
| Class I A | $1,125,000.00 | Payment in full on the Effective Date | $1,250,000.00 (inclusive of estimated accrued interest) |
| Class I B | $7,192,191.95 | Payment in full on the Effective Date | $4,080,000.00 |
| Class II | $18,400.00 | Payment in full on the Effective Date | $0.00 |
| Class III | $2,458.52 | Payment in full on the Effective Date | $0.00 |
| Class IV | $1,108,751.41 | Payment in full of all Allowed Claims on the Effective Date or the date the Court | $0.00 |

| | | enters an order allowing the claims | |
| Class V | $4,736,732.00 | Payment of pro rata distribution as outlined in Section VIII.E | $0.00 |

### C. Feasibility

Section 1129(a)(11) of the Code requires a finding that confirmation of a Plan is not likely to be followed by the liquidation of the reorganized Debtor or the need for further financial reorganization. In evaluating whether the Plan satisfies this feasibility standard, the Debtor has analyzed the ability of the Debtor to operate following confirmation of the Plan. Following confirmation of its Plan, the New Financing will be sufficient to make Plan payments and to pay its creditors in the ordinary course.

### D. Confirmation

In order for the Court to confirm the Plan, an affirmative vote must be cast by each Class which is considered "impaired" by each Plan. Section 1126(c) of the Code provides that a Class of creditors accepts a Plan if the Plan is accepted by creditors holding at least two-thirds in dollar amount and one-half in number of the Allowed Interests of such class held by creditors who have voted to accept or reject the Plan. The holders of interests in Class V are impaired under the Plan, and therefore are required to vote. Section 1126(d) of the Code provides that a Plan is accepted by holders holding at least two-thirds in amount of the Allowed Interests of such class held by holders who have voted to accept or reject the Plan.

## XV. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain material U.S. federal income tax consequences expected to result from the consummation of the Plan as they relate to the Debtor and to beneficial owners of Claims and Interests (each a "Holder") entitled to vote on the Plan. This summary is intended for general information purposes only, is not a complete analysis of all potential federal income tax consequences that may be relevant to any particular Holder and does not address any tax consequences arising under any state, local or foreign tax laws or federal estate or gift tax laws. Accordingly, this summary should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular holder of a claim or interest.

This discussion is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial decisions, and published rulings and administrative pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date of this Disclosure Statement. These authorities may change, possibly with retroactive effect, resulting in federal income tax consequences different from those discussed below. No ruling has been or will be sought from the IRS, and no legal opinion of counsel will be rendered, with respect to the matters discussed below. There can be no assurance that the IRS will not take a contrary position regarding the federal income tax consequences resulting from the consummation of the Plan or that any contrary position would be sustained by a court.

This summary does not apply to holders of Claims that are not United States persons for U.S. federal income tax purposes or that are otherwise subject to special treatment under U.S. federal income tax law (including, for example, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies and regulated investment companies). Moreover, this summary does not purport to cover all aspects of U.S. federal income taxation that may apply to the Debtor and holders of Claims based upon their particular circumstances. Additionally, this summary does not discuss any tax consequences that may arise under state, local or foreign tax law.

Holders should consult their tax advisers regarding the U.S. federal income tax consequences to them of the consummation of the Plan and the ownership and disposition of the promissory notes received pursuant to the Plan, as well as any tax consequences arising under any state, local or foreign tax laws, or any other federal tax laws.

This discussion is limited to the federal tax issues addressed herein. Additional issues may exist that are not addressed in this discussion and that could affect the federal tax treatment of consummation of the Plan. Holders of Claims should seek their own advice based on their particular circumstances from an independent tax adviser.

The Debtor's Plan provides that holders of certain priority and Class I A, I B, II, III, and IV Claims will receive cash distributions in satisfaction of their claims. In general, each Holder of such a claim may recognize gain or loss on account of such cash distributions.

**EACH CLAIM HOLDER OR INTEREST HOLDER IS URGED TO CONSULT WITH ITS OWN TAX ADVISOR AS TO THE CONSEQUENCES OF THE PLAN TO IT UNDER FEDERAL AND APPLICABLE STATE, LOCAL AND FOREIGN TAX LAWS.**

### A. Federal Income Tax Consequences to the Debtor: Cancellation of Indebtedness and Reduction of Attributes

The discharge of a debt obligation for an amount less than the remaining amount due on the obligation (as determined for federal income tax purposes) generally will give rise to cancellation of indebtedness ("COD") income that must be included in the debtor's income, subject to certain exceptions. In particular, under section 108 of the Tax Code, COD income will not be included in a debtor's income (i) to the extent of the debtor's insolvency (the "Insolvency Exception") or (ii) if the discharge of the debt obligation occurs in a case brought under the Bankruptcy Code, the debtor is under the court's jurisdiction in such case and the discharge is granted by the court or is pursuant to a plan approved by the court (the "Bankruptcy Exception"). In the case of a debtor that is a partnership for federal tax purposes, the Insolvency Exception and Bankruptcy Exception are applied at the partner or member level rather than the partnership or company level. The Debtor expects that the aggregate value of the payments distributed with respect to the Claims, as applicable, will be less than the aggregate value of those Claims (including any unpaid interest accrued thereon). Therefore, the Debtor expects that the consummation of the Plan will produce a significant amount of COD income which will be tested for inclusion under Section 108 of the Tax Code.

7508068v1

Under the Tax Code, a debtor that excludes COD from income under the Insolvency Exception or the Bankruptcy Exception generally must reduce certain tax attributes by a corresponding amount. Attributes subject to reduction include attributes (such as net operating losses ("NOLs"), NOL carryforwards and certain other losses, credits and carryforwards) attributable to the debtor and the debtor's tax basis in its assets (including stock of subsidiaries). A debtor's tax basis in its assets generally may not be reduced below the amount of its liabilities remaining immediately after the discharge of indebtedness. In the case of a partnership, the reduction of attributes is applied at the partner or member level.

### B.    Federal Income Tax Consequences to Holders of Certain Claims

The United States federal income tax consequences of the transactions contemplated by the Plan to holders of Claims (including the character, timing and amount of income, gain or loss recognized) will depend significantly on such Holder's individual circumstances. Therefore, holders of Claims should consult their tax advisors to determine the particular tax consequences to them of the transactions contemplated by the Plan. This discussion assumes that the Holder has not taken a bad debt deduction with respect to a Claim (or any portion thereof) in the current or any prior year and such Claim did not become completely or partially worthless in a prior taxable year. The discussion further assumes that the claims are held by Holders as capital assets.

### 1.    Allocation of Payments Between Principal and Interest

To the extent that any Claim entitled to a distribution under the Plan is composed of indebtedness and accrued but unpaid interest thereon, the Debtor intends to take the position that, for income tax purposes, such distribution should first be allocated to the principal amount of the Claim and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest. The IRS, however, may take a contrary position and therefore no assurances can be made in this regard. If, contrary to the Debtor's intended position, such a distribution were treated as being allocated first to accrued but unpaid interest (or if the consideration received by any Holder exceeds the principal amount of the Claim surrendered in exchange therefor), a Holder of such a Claim would realize ordinary income with respect to the distribution in an amount equal to the accrued but unpaid interest not already taken into income under the Holder's method of accounting, regardless of whether the Holder otherwise realizes a loss as a result of the Plan. A Holder of a Claim should also recognize ordinary income on the exchange (but not in excess of the amount of gain recognized, as described below) to the extent a distribution is received in exchange for market discount not previously taken into account under the holder's method of accounting.

### 2.    Treatment of Other Claims

The federal income tax consequences to a Holder who holds Claims other than the Priority Claims may be different from the tax consequences described above. Holders of such Claims should consult their tax advisers regarding the potential federal income tax consequences of holding such Claims.

7508068v1

### 3. Withholding and Reporting

Payments of interest, dividends, and certain other payments are generally subject to backup withholding at the rate of 28% unless the payee furnishes his, her or its correct taxpayer identification number to the payor. The Debtor, or a third-party agent of the Debtor, may be required to withhold the applicable percentage of any payments made to a holder who does not provide its taxpayer identification number. Backup withholding is not an additional tax, but an advance payment that may be refunded to the extent it results in an overpayment of tax. Taxpayers may use amounts withheld as a credit against their federal income tax liability or may claim a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS. Holders may be subject to backup withholding on the consideration received pursuant to the Plan. Certain Holders (including corporations) generally are not subject to backup withholding. A Holder that is not otherwise exempt generally may avoid backup withholding by furnishing to the Debtor its taxpayer identification number and certifying, under penalties of perjury, that the taxpayer identification number provided is correct and that the Holder has not been notified by the IRS that it is subject to backup withholding.

The Debtor may be obligated to furnish information to the IRS regarding the consideration received by Holders pursuant to the Plan. In addition, the Debtor may be required to report annually to the IRS with respect to each Holder, the amount of any tax withheld from payment thereof. Certain Holders (including corporations) generally are not subject to information reporting.

> **THE FOREGOING IS INTENDED TO BE ONLY A SUMMARY OF CERTAIN FEDERAL INCOME TAX CIRCUMSTANCES OF THE PLAN, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FEDERAL, STATE AND LOCAL INCOME AN OTHER TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. SUCH CONSEQUENCES MAY ALSO VARY BASED ON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTEREST. ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH HIS, HER OR ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, AND LOCAL INCOME AND OTHER TAX CONSEQUENCES UNDER THE PLAN. NEITHER THE DEBTOR NOR THEIR PROFESSIONALS WILL HAVE ANY LIABILITY TO ANY PERSON OR HOLDER ARISING FROM OR RELATED TO THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN OR THE FOREGOING DISCUSSION.**

## CONCLUSION

It is important that creditors and interest holders exercise their rights to vote for the acceptance or rejection of the Plan. As noted above, the Debtor believes that acceptance of the Plan is in the best interest of all parties. The Debtor requests that each holder of a Claim in each Class and each holder of an interest in the foregoing Classes complete the ballot and vote to accept the proposed Plan.

Dated: March 15th, 2011

PFG ASPENWALK, LLC

By: _Thomas H. Klassen_

Its: _VP – Operating_

# EXHIBIT A TO DISCLOSURE STATEMENT
## PLAN

**See Attached**

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

PFG ASPENWALK, LLC,

        Debtor.

Chapter 11

Case No. 10-47089-RJK

## DEBTOR'S PLAN OF REORGANIZATION

Dated: March 15, 2011

*/e/ Lara O. Glaesman*

Robert T. Kugler (# 0194116)
Lara O. Glaesman (# 0316866)
Adine S. Momoh (# 0390085)
**LEONARD, STREET AND DEINARD**
 *Professional Association*
150 South Fifth Street, Suite 2300
Minneapolis, Minnesota 55402
Telephone: (612) 335-1500
Facsimile:  (612) 335-1657

**ATTORNEYS FOR THE DEBTOR**

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................................1

II.     DEFINITIONS .................................................................................................................1

III.    SUMMARY OF PLAN FUNDING...............................................................................4

IV.    SUMMARY OF POST-PETITION MANAGEMENT ................................................5

V.      UNCLASSIFIED CLAIMS ............................................................................................5

VI.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ...................7

VII.   GENERAL PROVISIONS ............................................................................................11

VIII.   MEANS OF EXECUTION OF PLAN AND FEASIBILITY .....................................12

IX.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND ADMINISTRATIVE CLAIMS..13

X.      ALTERNATIVES TO THE PLAN OF REORGANIZATION ...................................13

XI.    MODIFICATION OF THE PLAN................................................................................14

XII.   CONTINUING JURISDICTION OF THE BANKRUPTCY COURT ........................14

XIII.   CONTESTED CLAIMS ...............................................................................................15

XIV.   RESERVATION OF ALL RIGHTS, CLAIMS, ACTIONS........................................16

XV.   DISCHARGE, RELEASE AND EFFECT OF CONFIRMATION .............................16

XVI.   MISCELLANEOUS PROVISIONS ............................................................................16

7508071v1

# I. INTRODUCTION

Debtor proposes the following Plan for approval by the creditors and other interested parties:

# II. DEFINITIONS

For the purposes of this Plan, the following terms shall have the respective meanings hereinafter set forth. Any terms contained in the Plan that are not specifically defined shall have the meaning provided for in the Bankruptcy Code, unless the context otherwise requires.

(a) "Administrative Claim" means any Claim for payment of an administrative expense of a kind specified in Section 503(b) of the Code and entitled to priority pursuant to Section 507(a)(1) of the Code.

(b) "Allowed Administrative Claim" means any Allowed Claim that is also an Administrative Claim.

(c) "Allowed Claim" means any Claim or portion of a Claim that is an allowed claim under Section 502 of the Code.

(d) "Allowed Priority Claim" means an Allowed Claim that is entitled to priority under Sections 507(a)(2)-(8) of the Code.

(e) "Bank of America" means Bank of America, N.A., as successor in interest to LaSalle Bank National Association, a national banking association.

(f) "Bank of America Loan" means the proceeds of the loan from Bank of America to the Debtor.

(g) "Bank of America Loan Documents" mean the various documents evidencing the loan by Bank of America to the Debtor.

(h) "Case" means the case of *United States of America, et al, v. Thomas J. Petters, et al*, Case No. 08-CV-5348.

(i) "Chapter 11 Case" means the Chapter 11 case involving the Debtor.

(j) "Claim" means a claim against the Debtor as defined in Section 101(5) of the Code.

(k) "Code" means the Bankruptcy Reform Act of 1978, as amended and codified in title 11 of the United States Code, and, where applicable, the Federal Rules of Bankruptcy Procedure.

(l) "Common Units" means the Common Units held by each holder as set forth in Section VI.E of this Plan and Section VIII.E of the Disclosure Statement.

(m)     "Common Unit Holders" means the holders of Common Units.

(n)     "Conceptual PUD" means Conceptual Planned Unit Development.

(o)     "Conceptual PUD Approval" means the Conceptual Planned Unit Development approval granted by the Aspen City Counsel for the Development Property.

(p)     "Confirmation Date" means the date on which a Final Order confirming the Plan is entered by the Court pursuant to Section 1129 of the Code.

(q)     "Confirmation Order" means the Final Order entered by the Court confirming the Plan pursuant to Section 1129 of the Code.

(r)     "Court" means the United States Bankruptcy Court of the District of Minnesota.

(s)     "Creditors Committee" means (a) after the U.S. Trustee appoints an official committee of creditors in the Chapter 11 Case, such official committee, and (b) after the Confirmation Date, an informal committee of creditors consisting of the members of the official committee if an official committee of creditors has been appointed, or such other persons as the committee may deem appropriate.

(t)     "Debtor" means PFG AspenWalk, LLC, a Delaware limited liability company.

(u)     "Development Property" means, collectively, the development of the Rental Property and the 414 Park Circle, Aspen, Pitkin County, Colorado property.

(v)     "DIP Financing" means debtor-in-possession financing.

(w)     "DIP Lender" means Rapid Funding, LLC.

(x)     "DIP Loan" means the loan authorized by the Bankruptcy Court, wherein the Debtor was authorized, on an interim basis, to obtain debtor-in-possession financing from the DIP Lender.

(y)     "Disclosure Statement" means the Debtor's Disclosure Statement provided to creditors in connection with this Chapter 11 Case.

(z)     "Disputed Claim" means any portion of any Claim (i) which has been scheduled with the Court as disputed, contingent, or unliquidated, or (ii) proof of which has been filed with the Court and to the allowance of which an objection has been filed within the time limitations fixed by the Code, this Plan or an order of the Court, and as to the allowability of which no determination has been made by Final Order of the Court.

(aa)    "Effective Date" means the thirtieth (30th) day after the Confirmation Date.

(bb)   "Final Order" means an order of the Court or the Federal District Court as to which (a) any appeal which has been taken has been finally determined or dismissed or (b) the time for appeal has expired and no appeal has been timely filed.

(cc)   "Final PUD" means Final Planned Unit Development.

(dd)   "Final PUD Approval" means the Final Planned Unit Development approval granted by the Aspen City Counsel for the Development Property.

(ee)   "Housing Authority" means the Aspen Pitkin County Housing Authority.

(ff)   "Interest" means the equity interest of any shareholder in the Debtor.

(gg)   "Membership Agreement" means the Amended and Restated Limited Liability Company Agreement of the Debtor, as amended from time to time.

(hh)   "New Financing" means new financing obtained after Final PUD Approval in the approximate amount of $9,000,000.00.

(ii)   "Petition Date" means September 23, 2010, the date that PFG AspenWalk, LLC filed a petition in this Court for reorganization under Chapter 11 of the U.S. Bankruptcy Code.

(jj)   "Petters Contribution" means the proceeds of an approximately $6.5 million equity contribution from Petters Real Estate.

(kk)   "Petters Real Estate" means Petters Real Estate Group LLC, a Delaware limited liability company.

(ll)   "Plan" means this Chapter 11 plan of reorganization and any amendments, or modifications thereto.

(mm)   "Plan Proponent" means the Debtor as proponent of this proposed Chapter 11 plan of reorganization and any amendments, or modifications thereto.

(nn)   "Preliminary Governmental Approvals" means, collectively, the City of Aspen Planning Commission's approval of the Debtor's plans for the Project on May 20, 2008, and on October 27, 2008.

(oo)   "Priming Lien" means the lien on the Debtor's assets held by Rapid Funding, LLC, which is senior to the lien on the Debtor's assets held by Bank of America.

(pp)   "Project" means the thirty-nine (39) unit condominium development, which was to be composed of fourteen (14) luxury units to be sold to the general public and twenty-five (25) work-force units to be sold to the Housing Authority.

7508071v1

(qq) "Pro Rata Share" means, as to a claimant, the amount determined by multiplying the total amount of the Debtor's payment to a particular class by a fraction, the numerator of which is the amount of the claimant's allowed claim and the denominator of which is the total amount of all allowed claims in that class.

(rr) "Rapid Funding" means the DIP Lender, Rapid Funding, LLC, a Colorado limited liability company.

(ss) "Rapid Funding Loan Documents" mean the various documents evidencing the loan by Rapid Funding to the Debtor.

(tt) "Receiver" means Douglas A. Kelley, the receiver appointed in the Case.

(uu) "Rental Property" means real property located at 404 Park Avenue, Aspen, Pitkin County, Colorado.

(vv) "Rents" means rents, revenues, issues, profits, proceeds, receipts, income, accounts and other receivables arising out of or from the Rental Property.

(ww) "Sale Agreement" means the Debtor's rights under an Agreement to Buy and Sell Real Estate.

(xx) "Secured Claim" means any allowed claim that is determined to be secured pursuant to Section 506 of the Code.

(yy) "Series A Preferred Units" means the Series A Preferred Units held by each holder as set forth in Section VI.E of this Plan and Section VIII.E of the Disclosure Statement.

(zz) "Series A Preferred Unit Holders" means holders of Series A Preferred Units.

(aaa) "Settlement Agreement" means the settlement agreement entered into by the Receiver and Bank of America on August 26, 2010.

(bbb) "Tom Petters" means Thomas J. Petters.

(ccc) "Wehmhoff" means James Wehmhoff, an employee of Tom Petters.

## III.   SUMMARY OF PLAN FUNDING

The Debtor's Plan will be funded by obtaining New Financing. The Debtor has received a Letter of Interest from Kennedy Funding, Inc. for the New Financing, wherein the potential lender has proposed a $9,000,000 loan subject to, among other things, fifty-five percent (55%) loan to market value as determined by an appraiser chosen by the potential lender.[1] Additionally, the Debtor is exploring interest from other lenders and expects to receive other

---

[1] A copy of the Kennedy Funding, Inc. Letter of Interest is available upon request.

competitive bids for New Financing.  Following the closing of the New Financing, there will be sufficient cash generated for the benefit of the Debtor's estate so that the Debtor will be able to pay all of the allowed claims of its secured and unsecured creditors.

Upon the Effective Date of the Plan, the current management of the Debtor will continue controlling the Debtor's affairs and all of the Debtor's Assets and will disburse funds and carry-out most of the provisions of the Plan, and remain in control of the bankruptcy-related matters of the Debtor's estate.  Specifically, the Debtor will continue examining claims for determination as to allowed claim amounts and pursue claim objections and pursue adversary proceedings, including but not limited to any preference actions, actions to subordinate claims, and fraudulent transfer claims.

## IV.    SUMMARY OF POST-PETITION MANAGEMENT

On the Effective Date, the Common Unit Holders and Series A Preferred Unit Holders will be the total of the Class V claimants (see above).  On the Effective Date, the management of the reorganized debtor will be the same as the management of the Debtor.  Specifically, the current managers and executive officers of Debtor will continue to be employed by the Debtor after confirmation of the Plan and will receive $150,000.00 as a restructuring consultation fee to be paid after the Effective Date:

| Name | Position(s) With Debtor |
| --- | --- |
| Thomas S. Hay | President |
| Thomas H. Klassen | Vice President of Operations |
| Thomas Salmen | Vice President of Finance |

The Debtor is not aware of any violation of fiduciary duties by officers or governors of the Debtor.  The Debtor has no current plans to make any other changes in its management structure or personnel.

## V.    UNCLASSIFIED CLAIMS

Unclassified Claims include:

(a)    All fees payable, including quarterly fees payable to the United States Trustee and any court fees, as required under 28 U.S.C. § 1930(a)(6).  As of the date hereof, these fees are current.

(b)    Post-petition Claims, incurred in the ordinary course of the Debtor's business other than those listed in paragraph c and d below.  These post-petition payments are current.

(c)    Allowed Priority Expense Claims, except as otherwise classified herein, including:

(1) Allowed administrative expense fees and expenses of counsel for the Debtor pursuant to 11 U.S.C. § 503(b), as well as any other professionals hired by the Debtor and whose retention and fees have been or will be approved by the Court.

(2) Administrative Claims of taxing authorities for post-petition taxes under 11 U.S.C. § 507(a)(2) and 503(b). The post-petition taxes are current.

(3) Claims of taxing authorities for pre-petition taxes entitled to priority by reason of 11 U.S.C. § 507(a)(8).

<u>Description and Treatment of Administrative Priority Claims</u>:

The Debtor shall pay each holder of the foregoing Allowed Administrative Claims the full amount of such Allowed Administrative Claim (a) in cash on the Effective Date, or as soon as practicable thereafter, but no later than ten (10) business days after the Effective Date, or (b) in accordance with such terms to which Debtor and the holder of such Allowed Administrative Claim may agree in writing; provided, however, that (i) Allowed Administrative Claims related to executory contracts and unexpired leases shall not be paid prior to the date on which such contracts and leases are actually assumed pursuant to Section IX of this Plan and (ii) Allowed Administrative Claims with respect to liabilities incurred by Debtor in the ordinary course of business during the Chapter 11 Case shall, at the option of Debtor, be paid in the ordinary course of business in accordance with their terms. Allowed Administrative Claims related to executory contracts and unexpired leases shall be paid in accordance with their original terms or such different terms to which Debtor and the holders of such claims may agree.

The Debtor will continue to pay all fees payable, including quarterly trustee fees, and any other court fees, that come due until the Chapter 11 case is closed, converted or dismissed, as required by 28 U.S.C. § 1930, but subject to any amendments to the Bankruptcy Code made retroactively applicable to this case. After confirmation of the Plan, the Debtor will submit quarterly operating reports to the United States Trustee, in the format prescribed by the United States Trustee until the case is closed, dismissed or converted and to pay such Administrative Claims to the Office of the United States Trustee as described in the Bankruptcy Code and Rules.

<u>Description and Treatment of Non-Administrative Priority Claims</u>:

The Debtor shall pay all Allowed Priority Claims under § 507(a)(2) – (7), if any, in full on the Effective Date, or as soon as practicable thereafter, or shall be paid in accordance with such terms as may have been or may be agreed upon by Debtor and the respective claimants. The Debtor estimates that there are no claimants holding Allowed Priority Claims under § 507(a)(2) – (7).

Allowed claims arising under § 507(a)(8) will, unless otherwise agreed, receive payment in full satisfaction of their claims term notes in principal amounts equal to the Allowed Claims payable, with interest at the rate set for Current Mid Term AFRs for instruments having a term in excess of three (3) years but no greater than (9) years published by the U.S. Internal Revenue Service for the most recent month available prior to the Effective Date. Such term notes will be payable in monthly cash installments sufficient to fully amortize such claims over terms not

exceeding five (5) years after the Effective Date. At this time, no claims have been filed that are entitled to priority payment under § 507(a)(8), and the Debtor is not aware of any such outstanding claims.

The following professionals have been approved by the Court: (i) Leonard, Street and Deinard, counsel for the Debtor; and (ii) Garfield & Hecht, P.C., special counsel for the Debtor. Other professionals may be employed only after court approval during the administration of this case. The Debtor estimates that the total outstanding administrative claims arising from attorneys' fees and costs incurred in connection with this Chapter 11 proceeding will be approximately $100,000.00. The Debtor estimates that the total outstanding administrative claims arising from the payments to the developer overhead for the Project will be $30,000.00. The payment of such amounts will be paid on the Effective Date.

## VI.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

All Classified Claims against and Interests in the Debtor are described below, along with the treatment to be afforded each class under the Plan.

### A.    Class I- Claims Secured in Whole or Part by Real Estate

#### 1.    Class I A: Secured Claim of Rapid Funding, LLC

Description:

The Class I A Claim shall consist of the Secured Allowed Claim held by Rapid Funding, in the amount of approximately $540,000.00, plus whatever the Debtor gets in the next DIP draw, up to $585,000.00 (inclusive of interest) or such other amount as shall be agreed upon by Debtor and Rapid Funding or determined by the Court to be secured pursuant to § 506 of the Code. The Class I A Claim consists of the remaining unpaid principal balance of secured loans from Rapid Funding to Debtor plus accrued but unpaid interest as of the Effective Date. As of the date the Disclosure Statement was prepared, the Debtor was indebted to Rapid Funding as follows:

| | |
|---|---|
| Rapid Funding Claim under the Note (including principal and interest) | $540,000, plus whatever the Debtor gets in the next DIP draw, up to $585,000.00 |
| **TOTAL** | **$1,125,000.00** |

Treatment:

The Debtor proposes to pay $540,000.00, plus whatever the Debtor gets in the next DIP draw, up to $585,000.00, plus any allowed additional attorneys fees as a secured claim to Rapid Funding on the Effective Date. In exchange for receiving payment in full of its Class I A Claim, on or before the Effective Date, Rapid Funding shall execute all necessary documents to release its mortgage(s) and liens and security interests in the assets of the Debtor. The holder of the Class I A Claim is deemed unimpaired under the Plan.

## 2.    Class I B: Secured Claims of Bank of America

Description:

The Class I B Claim shall consist of the Secured Allowed Claim held by Bank of America in the amount of approximately $6,488,884.77 or such other amount as shall be agreed upon by Debtor and Bank of America or determined by the Court to be secured pursuant to § 506 of the Code.  The Class I B Claim consists of the remaining unpaid principal balance of secured loans from Bank of America to Debtor plus accrued but unpaid interest and real estate taxes as of the Effective Date.  As of the Petition Date, the Debtor was indebted to Bank of America as follows:

| Bank of America Claim under the Note (including principal and interest) | $6,488,884.77 |
|---|---|
| **TOTAL**[2] | **$6,448,884.77** |

Treatment:

The Debtor proposes to pay $6,488,884.77, plus any allowed additional attorneys fees as a secured claim to Bank of America on the Effective Date.  In exchange for receiving payment in full of its Class I B Claim, on or before the Effective Date, Bank of America shall execute all necessary documents to release its mortgage(s) and liens and security interests in the assets of the Debtor.  The holder of the Class I B Claim is deemed unimpaired under the Plan.

## B.    Class II- Unsecured Priority Claims

Description:

This class shall consist of Allowed Unsecured Priority Claims for tenant security deposits and prepaid rent to tenants of the Rental Property.

Treatment:

The holders of Class II Allowed Claims will be paid a total of 100% of their claims on the Effective Date.  Such payments shall be in full satisfaction of each Allowed Unsecured Claim Priority Claim.  The Debtor estimates that there are eleven (11) claims totaling approximately $18,400.00 in claims in Class II.

## C.    Class III- General Unsecured Claims-Convenience Claims

Description:

This class shall consist of Allowed Unsecured Claims not entitled to priority where the total of the allowed claim does not exceed $500.00.  Any unsecured creditor whose claim

---

[2] As an oversecured creditor, Bank of America is also entitled to an unspecified amount of reasonable attorneys' fees for post-petition services.  The Debtor reserves the right to object to the awarding of these additional fees in whole or in part.

exceeds $500.00 may elect this treatment by voting in the Plan to be treated as a Class II creditor by electing to reduce the creditor's total claim to $500.00. The holders of Class II claims shall be paid their Allowed Claims as follows:

Treatment:

The holders of Class II Allowed Claims will be paid a total of 100% of their claims on the Effective Date. Such payments shall be in full satisfaction of each Allowed Unsecured Claim. The Debtor estimates that there are seven (7) claims totaling approximately $2,548.52 in claims in Class II.

### D.     Class IV- General Unsecured Claims

Description:

This class shall consist of Allowed Unsecured Claims not entitled to priority and not treated in any other class in the Plan, including the unsecured portion of any secured claim. The total unsecured debt (either as scheduled by the debtor or pursuant to allowed proofs of claims) is approximately $1,108,751.41. The Debtor estimates that there are two (2) creditors in Class IV. The holders of general unsecured claims shall be paid their Allowed Claims over time, and treated as follows:

Treatment:

The holders of Class IV Allowed Claims will be paid their Allowed Claims on the Effective Date or the date the Court enters an order allowing the Class IV claim, whichever is later. Such payments shall be in full satisfaction of each Allowed Unsecured Claim. The Debtor estimates that there is approximately $1,108,751.41 of debt in the unsecured Class IV Claims, not including objectionable claims. The Debtor estimates that there are two (2) creditors in Class IV.

The holders of the Class IV Claims are deemed unimpaired under the Plan.

### E.     Class V- Equity Interests

Description:

This class shall consist of the allowed ownership interests of the Debtor by its Common Unit Holders and Series A Preferred Unit Holders as follows:

| Current Capitalization | | | |
|---|---|---|---|
| *Common Unit Holders* | *Units* | *% of Common* | *Capital Contribution* |
| Thomas Hay (President) | 225,000 | 69.2% | $807,326 |
| Thomas Klassen (VP Operations) | 50,000 | 15.4% | $89,703 |
| Thomas Salmen (VP Finance) | 50,000 | 15.4% | $89,703 |
| **Common Unit Total =** | 325,000 | 100.0% | $986,732 |

| Series A Preferred Unit Holders (Non-voting) | Units | % of Srs A Pref | Capital Contribution |
|---|---|---|---|
| Falcon Partners, LTD. | 550,000 | 14.7% | $550,000 |
| Patricia A. Hamm | 100,000 | 2.7% | $100,000 |
| Graham O. King Family, LLC | 500,000 | 13.3% | $500,000 |
| Jedco Properties, LLC | 500,000 | 13.3% | $500,000 |
| Mary L. Jeffries | 50,000 | 1.3% | $50,000 |
| Lancer Partners, LLC | 500,000 | 13.3% | $500,000 |
| Jane K. Mauer | 250,000 | 6.7% | $250,000 |
| Mark Laumann | 25,000 | 0.7% | $25,000 |
| Ark Royal Aspen Realty, LLC | 975,000 | 26.0% | $975,000 |
| Sun Investments, LLC | 300,000 | 8.0% | $300,000 |
| **Series A Preferred Unit Total =** | 3,750,000 | 100.0% | $3,750,000 |
| | | | |
| **TOTAL =** | | | $4,736,732 |

The holders of Class V Interests shall retain their respective interests (except that any outstanding warrants, options, or other rates, commitments, or agreements of any nature, if any, to require additional membership interests of Debtor are cancelled and terminated). All holders of Class V Interests shall execute a membership interest agreement generally requiring them to exercise their rights and powers as owners of membership interest to execute the terms of this Plan.

The Class V interests are deemed impaired under this plan.

Treatment:

All Common Unit Holders and Series A Preferred Unit Holders shall receive a pro rata distribution pursuant to the terms of the Membership Agreement and after the Effective Date, will receive the same percentage of ownership in the reorganized debtor and the Common Unit Holders and Series A Preferred Unit Holders will remain as owners of the Debtor, as diluted by the ownership interests awarded Class V Claimants as follows:

| Capitalization after Dilution | | | |
|---|---|---|---|
| Common Unit Holders | Units | % of Ownership | Capital Contribution |
| Thomas Hay (President) | 161,917 | 16.2% | $807,326 |
| Thomas Klassen (VP Operations) | 17,991 | 1.8% | $89,703 |
| Thomas Salmen (VP Finance) | 17,991 | 1.8% | $89,703 |
| Falcon Partners, LTD. | 110,308 | 11.0% | $550,000 |
| Patricia Hamm | 20,056 | 2.0% | $100,000 |
| Graham O. King Family, LLC | 100,280 | 10.0% | $500,000 |
| Jedco Properties, LLC | 100,280 | 10.0% | $500,000 |
| Mary Jeffries | 10,028 | 1.0% | $50,000 |

| | | | |
|---|---|---|---|
| Lancer Partners, LLC | 100,280 | 10.0% | $500,000 |
| Jane Mauer | 50,140 | 5.0% | $250,000 |
| Mark Laumann | 5,014 | 0.5% | $25,000 |
| Ark Royal Aspen Realty, LLC | 195,546 | 19.6% | $975,000 |
| Sun Investments, LLC | 60,168 | 6.0% | $300,000 |
| Rapid Funding, LLC | 50,000 | 5.0% | |
| **Total =** | 1,000,000 | 100.0% | $4,736,732 |

The holders of Class V Interests shall retain their respective interests (except that any outstanding warrants, options, or other rates, commitments, or agreements of any nature, if any, to require additional membership interests of Debtor are cancelled and terminated). All holders of Class V Interests shall execute a membership interest agreement generally requiring them to exercise their rights and powers as owners of membership interest to execute the terms of this Plan.

The Class V interests are deemed impaired under this plan. Holders of Class V should be deemed under 11 U.S.C. 1129 to have accepted the terms of the Plan.

## VII.    GENERAL PROVISIONS

A.    Payments under this Plan will be made by check, mailed postage prepaid, to the Claimant at the address listed on its proof of claim or, if no proof of claim has been filed, to the address listed on the schedule.

B.    Except as to any Claims of Taxing Authorities, if applicable, the Debtor reserves the right to designate the application of any payment on a Claim under this Plan.

C.    In the event a payment is returned to the Debtor unclaimed, with no indication of Claimant's forwarding address, the Debtor will hold such payment for a period of sixty (60) days from the date of return. If not claimed by Claimant by the end of that period, the payment shall become the property of the Debtor.

D.    Proofs of Claims or Interests not timely filed will not participate in distributions under this Plan and will be discharged under Bankruptcy Code § 1141(d) unless scheduled by the Debtor or otherwise ordered by the Court.

E.    In the event this Plan is not confirmed under Bankruptcy Code § 1129(a), the Debtor requests that this Plan be confirmed under Bankruptcy Code § 1129(b).

F.    The articles and bylaws of the Debtor shall be amended as required by Bankruptcy Code § 1123(a)(6) and as may otherwise be required by this Plan.

G.    Unless otherwise set forth in this Plan, any creditor holding a deposit, including but not limited to utilities deposits, shall return to the Debtor the full amount of the deposit, without the right to setoff, as soon as practicable following entry of the Confirmation Order confirming the Plan.

7508071v1

**H.** As of the Confirmation Date, the current management team will continue to manage the Debtor.

**I.** Contingent unliquidated Claims, including any guarantees of the Debtor, will be paid to the extent and manner agreed upon by the Debtor and the affected parties as approved by the Court, or as liquidated by the Court after hearing, as a general unsecured Claim under Class IV.

**J.** Any funds or benefits received by the Debtor by virtue of any adversary proceeding, claim, preference action, or any other legal right assertable by the Debtor under the Bankruptcy Code, or other law, shall remain the property of the Debtor, and may be used by the Debtor for its operations or to fund the Plan.

**K.** If the Effective Date or any other date on which a transaction may occur under this Plan shall occur on a day that is not a Business Day, the transactions contemplated by this Plan shall occur on the next succeeding Business Day.

## VIII. MEANS OF EXECUTION OF PLAN AND FEASIBILITY

The Debtor's Plan will be funded by obtaining New Financing. The Debtor has received a Letter of Interest from Kennedy Funding, Inc. for the New Financing, wherein the potential lender has proposed a $9,000,000 loan subject to, among other things, fifty-five percent (55%) loan to market value as determined by an appraiser chosen by the potential lender. Additionally, the Debtor is exploring interest from other lenders and expects to receive other competitive bids for New Financing. Following the closing of the New Financing, there will be sufficient cash generated for the benefit of the Debtor's estate so that the Debtor will be able to pay all of the allowed claims of its secured and unsecured creditors in full.

Upon the Effective Date of the Plan, the current management of the Debtor will continue controlling the Debtor's affairs and all of the Debtor's Assets and will disburse funds and carry-out most of the provisions of the Plan, and remain in control of the bankruptcy-related matters of the Debtor's estate. Specifically, the Debtor will continue examining claims for determination as to allowed claim amounts and pursue claim objections and pursue adversary proceedings, including but not limited to any preference actions, actions to subordinate claims, and fraudulent transfer claims.

The Debtor's management team, after confirmation, will manage its affairs and disburse funds, serving as required as disbursing agent. The Debtor will provide or pay out of operating funds for all of its administrative expenses and business debts in the ordinary course of business, according to this Plan.

Attached to the Disclosure Statement and marked as **Exhibit E** are projections prepared by the Debtor.

## IX. EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND ADMINISTRATIVE CLAIMS

Attached to the Disclosure Statement and marked as **Exhibit D** is a list of the executory contracts and leases to which the Debtor is a party. As to each such contract or lease, the exhibit indicates whether the Debtor has assumed the contract or lease, entered into a new or replacement contract or lease, or has or intends to reject or assume the contract or lease pursuant to this Plan. The Debtor may file any amendments to the list of contracts or leases it intends to reject, assume, or assume and assign up until twenty (20) days prior to confirmation of the Plan. If any executory contracts or leases are not listed on Exhibit D to the Disclosure Statement, said contract or lease shall be deemed rejected, if not previously rejected, as of the Confirmation Date.

Unless otherwise ordered by the Court, a party to a rejected contract or lease under the Plan shall have (thirty) 30 days following the Confirmation Date to file a proof of claim for any damages incurred because of the rejection, if any. The Debtor shall, thereafter, have twenty (20) days to file an objection to any such proofs of claim.

Unless otherwise ordered by the Court, any party holding an Administrative Claim, which has received a copy of this Plan, shall have thirty (30) days following the confirmation date to file a request for payment of administrative expenses pursuant to the applicable provisions of the Bankruptcy Code and Rules. Failure to file such a request in a timely manner shall be deemed a waiver of the claim and the Debtor shall not be obligated to pay such claim.

## X. ALTERNATIVES TO THE PLAN OF REORGANIZATION

In proposing this Plan, various alternatives to the Plan have been considered and evaluated by the Debtor, including sale of the Debtor and liquidation under Chapter 7 of the Bankruptcy Code. The Debtor considered these and other alternatives, and is convinced that the Plan, in comparison, provides a greater recovery to creditors on a more expeditious time table than the alternatives.

If the Debtor's Plan, or any other Chapter 11 plan cannot be confirmed, the Chapter 11 case may be converted to a case under Chapter 7 of the Bankruptcy Code, in which a trustee would be appointed to liquidate the assets of Debtor. The Debtor's estimate of the effect that a Chapter 7 liquidation would have on recovery to holders of claims and interest is set forth in the Liquidation Analysis attached to the Disclosure Statement as **Exhibit F**. If a trustee is appointed and the remaining assets of the Debtor are liquidated under Chapter 7 of the Bankruptcy Code, the Debtor believes that creditors holding general unsecured claims will receive distributions of a lesser value on account of their allowed claims.

The Debtor believes strongly that acceptance of the Plan is in the best interest of the Debtor's creditors. Based upon the financial projections discussed above, the Debtor believes it can offer more to unsecured claimants than under a liquidation scenario, in which the Debtor's assets are returned to the primary secured creditors, and other priority claimants. If liquidation were to occur, only secured claimants would receive anything and unsecured creditors would receive nothing as illustrated in the Liquidation Analysis.

## XI.  MODIFICATION OF THE PLAN

Prior to the Confirmation Date, the Debtor may alter, amend or modify the Plan in accordance with 11 U.S.C. § 1127 or § 1129(a) or (b) of the Bankruptcy Code.  After the Confirmation Date, but prior to substantial consummation of the Plan, the Debtor may institute proceedings with the Court to remedy any defect or omission or reconcile any inconsistency in the Plan, so long as such proceedings do not materially adversely affect the treatment of holders of any Claims, provided that prior notice of such proceedings shall be served in accordance with applicable rules or order of the Court.

## XII.  CONTINUING JURISDICTION OF THE BANKRUPTCY COURT

### A.  Jurisdiction

Until the Chapter 11 Case is closed, the Court shall retain the fullest and most extensive jurisdiction that is permissible, including that necessary to ensure that the purposes and intent of this Plan are carried out and to hear and determine all claims that could have been brought before the entry of the Confirmation Order.  Except as otherwise provided in this Plan, the Court shall retain jurisdiction to hear and determine all claims against Debtor and to adjudicate and enforce all causes of action that may exist on behalf of Debtor.  Nothing contained herein shall prevent Debtor from taking such action as may be necessary to enforce or prosecute any cause of action that Debtor has or may have and that may not have been enforced or prosecuted by Debtor, which cause of action shall survive confirmation of this Plan and shall not be affected thereby except as specifically provided herein.

### B.  General Retention

Following confirmation of this Plan, the court shall also retain jurisdiction for the purposes of classifying any claim, re-examining claims that have been allowed for purposes of voting and determining such objections as may be filed with the court with respect to any claim. The failure by Debtor to object to or examine any claim for the purposes of voting shall not be deemed a waiver of the right of Debtor to object to or re-examine such claim, in whole or in part.

### C.  Specific Purposes

In addition to the foregoing, after confirmation of the Plan the court shall retain jurisdiction to the maximum extent legally permissible, including for the following specific purposes:

(a)  to modify this Plan after confirmation, pursuant to the Code;

(b)  to correct any defect, cure any omission or reconcile any inconsistency in this Plan or the Confirmation Order as may be necessary to carry out the purposes and intent of this Plan, including the adjustment of the date(s) of performance under this Plan and any documents related thereto so that the intended effect of this Plan and such other documents may be substantially realized thereby;

7508071v1

(c)  to enforce and interpret the terms and conditions of this Plan;

(d)  to enter such orders including, but not limited to, injunctions as are necessary to enforce the title, rights and powers of Debtor;

(e)  to hear and determine any motions or contested matters involving taxes, tax refunds, tax attributes, tax benefits and similar or related matters with respect to Debtor, or its estate arising prior to the Effective Date or relating to the period of administration of the Chapter 11 Case;

(f)  to hear and determine all applications for compensation of professionals and reimbursement of expenses under Sections 330, 331 or 503(b) of the Code;

(g)  to hear and determine any causes of action arising during the period from the date a petition is filed through the Effective Date, or in any way related to this Plan or the transactions contemplated hereby, against Debtor, the Creditors Committee or their respective officers, directors, stockholders, members, attorneys, financial advisors, representatives and agents;

(h)  to determine any and all motions pending on confirmation for the rejection, assumption or assignment of executory contracts or unexpired leases and the allowance of any claim resulting therefrom;

(i)  to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(j)  to consider and act on the compromise and settlement of any claim against the interest in Debtor or its estate;

(k)  to determine all questions and disputes regarding title to the assets of Debtor or its estate;

(l)  to enter such orders as are necessary to implement and enforce any other orders entered in the Chapter 11 Case; and

(m)  to hear and determine any other matters related hereto and not inconsistent with the Code.

## XIII.  CONTESTED CLAIMS

The Debtor, or any party in interest, has the right to object to Claims filed with the Court and served upon each holder of a Disputed Claim up to and including thirty (30) days following the Effective Date of the Plan, or such other time as the Court may direct.  The figures, valuations, or numbers given for Claims in the Disclosure Statement and this Plan are approximations.  The Debtor will examine all Claims and file any objections to such Claims as are appropriate.  Any such Claims for which an objection has been filed or with respect to which a determination of value must be made, shall be paid when, and to the extent allowed or

determined by the Court, or as otherwise agreed to by the Debtor and such claimant, and approved by the Court.

## XIV. RESERVATION OF ALL RIGHTS, CLAIMS, ACTIONS

Unless a claim or cause of action, at law or in equity, against a creditor or other entity is expressly waived, relinquished, released, compromised or settled in the Plan, the Debtor hereby expressly reserves such claim or cause of action and the right to pursue the same.

## XV. DISCHARGE, RELEASE AND EFFECT OF CONFIRMATION

As of the Effective Date, the rights afforded under the Plan shall be in exchange for and in complete settlement, satisfaction, payment, cancellation, discharge and release of all claims of any nature whatsoever against the Debtor or any of its assets or properties or its interests therein (excluding any subsidiaries of the Debtor), and all holders of Claims shall be precluded from asserting against the Debtor, its assets or properties, any other or further claims based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Confirmation Date; provided, however, that such release shall not be effective as to any obligation of Debtor under an executory contract or unexpired lease unless and until such lease or contract is rejected as provided hereunder and liens that are expressly stated to survive. The discharge of the Debtor shall be effective as to each claim regardless of whether a proof of claim was filed, whether the claim is an Allowed Claim, or whether the holder thereof votes to accept the Plan. Nothing in this Plan is intended to act as a release of any party other than the Debtor and the Debtor in Possession. Specifically, except as set forth in this Plan, nothing in the Plan, Disclosure Statement or confirmation order shall constitute a waiver or release of any claim, cause of action or legal right or defense that the Debtor had immediately prior to the commencement of the Chapter 11 case against or with respect to any claim or interest, including under any policy of insurance under which the Debtor has any right or interest.

## XVI. MISCELLANEOUS PROVISIONS

### A. Authority to Effectuate Plan

Upon the entry of the Confirmation Order by the Court, all matters provided under the Plan shall be deemed to be authorized and approved without further approval from the Court. Debtor's charters and by-laws may be modified and amended, to the extent necessary to effectuate the provisions of this Plan. Debtor shall authorize, without further application to or order of the Court, to take whatever action is necessary to achieve consummation of the Plan and to effectuate the distributions provided for hereunder.

### B. Time is of the Essence

All payments required to be made pursuant to this Plan shall be made in a timely fashion.

### C. Expenses of the Debtor

Any payment made or to be made by Debtor or by any person acquiring property pursuant to this Plan, for services or for costs and expenses in or in connection with the Chapter 11 Case, or

in connection with the Plan and incident to the Chapter 11 Case, must be approved by the Court as reasonable.

IN WITNESS WHEREOF, Debtor has executed this Plan of Reorganization as of the 15th day of March 2011.

PFG ASPENWALK, LLC

By: _Thomas H. K. Coson_

Its: _VP — Operating_

7508071v1

**EXHIBIT B TO DISCLOSURE STATEMENT**
**SAMPLE BALLOTS**


**See Attached**

2

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

PFG ASPENWALK, LLC,

        Debtor.

Chapter 11
Case No. 10-47089-RJK

## BALLOT FOR ACCEPTING OR REJECTING THE
## CHAPTER 11 PLAN OF REORGANIZATION

**CLASS \_\_\_\_: _____ CLAIMS**

**HOLDERS OF CLASS _____ _____ CLAIMS: YOUR BALLOT MUST BE RECEIVED BY COUNSEL FOR THE DEBTOR BY 4:00 P.M. (PREVAILING CENTRAL STANDARD TIME) ON _____, 2011, THE VOTING DEADLINE, OR YOUR VOTE WILL NOT BE COUNTED.**

       This is a ballot for the below-listed claim to vote to accept or reject the Chapter 11 Plan of Reorganization (the "Plan") for PFG AspenWalk, LLC (the "Debtor") filed by the Debtor. If you have more than one claim and/or equity interest entitled to vote in any Class, you will receive an additional ballot(s) on which to cast your vote.

PLEASE READ THIS ENTIRE BALLOT BEFORE COMPLETING. PLEASE COMPLETE, DATE, AND SIGN THIS BALLOT AND RETURN IT IN THE ENCLOSED PREADDRESSED, POSTAGE PREPAID ENVELOPE OR BY FIRST CLASS MAIL, OVERNIGHT COURIER OR HAND DELIVERY TO COUNSEL FOR THE DEBTOR. THIS BALLOT **MUST BE ACTUALLY RECEIVED** BY DEBTOR'S COUNSEL ON OR BEFORE _____, 2011 at **4:00 p.m. (prevailing Central Standard Time)**.

**<u>PLEASE READ THE FOLLOWING BEFORE COMPLETING YOUR BALLOT</u>**

This Ballot is submitted to you to solicit your vote to accept the Plan, which is described in the disclosure statement in support of the Plan (the "Disclosure Statement"). A copy of the Plan was filed separately with the Bankruptcy Court and enclosed with the Disclosure Statement. The United States Bankruptcy Court for the District of Minnesota (the "Bankruptcy Court") approved the Disclosure Statement by order dated _____, 2011 (the "Disclosure Statement Order"). The Disclosure Statement provides information to assist you in deciding whether to accept or reject the Plan. A copy of the Disclosure Statement is contained in the package accompanying this Ballot. If you did not receive a hard copy of the Plan and Disclosure Statement, you may obtain one by contacting the Debtor's counsel, Robert T. Kugler and Lara O. Glaesman, Leonard, Street and Deinard Professional Association, 150 South Fifth Street, Suite 2300, Minneapolis, Minnesota 55402.

Please complete, sign and date this Ballot and return it to Debtor's counsel at Leonard, Street and Deinard Professional Association, Attention: Robert T. Kugler and Lara O. Glaesman, 150 South Fifth Street, Suite 2300, Minneapolis, Minnesota 55402 in the enclosed preaddressed, postage prepaid envelope or (ii) if by hand delivery or overnight courier to the same address listed above. **If your Ballot is not ACTUALLY RECEIVED by _____, 2011 at 4:00 p.m. (Prevailing Central Standard Time), it will not be counted. Ballots transmitted by facsimile, telecopy transmission or electronic mail will not be accepted and will not be counted as a vote to accept or reject the Plan.**

On _____, 2011, the Bankruptcy Court also approved certain procedures for the solicitation (the "Solicitation and Voting Procedures") and tabulation (the "Tabulation Procedures") of votes to accept or reject the Plan. The Solicitation and Voting Procedures and the Tabulation Procedures are set forth in the Disclosure Statement Order that accompanies this Ballot.

**By signing this Ballot, you make the following certifications:**

- "I have received or obtained a copy of the Disclosure Statement and the exhibits thereto, including the Plan."

- "I understand that, if this Ballot is validly executed and returned without checking a box to ACCEPT or REJECT, this Ballot will not be counted."

- "I have the full power and authority to vote to accept or reject the Plan on behalf of the claimant listed herein."

The Plan can be confirmed by the Bankruptcy Court and thereby made binding on you if it is accepted by the holders of at least two-thirds in amount and more than one-half in number of the allowed claims in each Class of claims voting on the Plan. In the event the requisite acceptances are not obtained, the Bankruptcy Court may nevertheless confirm the Plan if the Bankruptcy Court finds that the Plan provides fair and equitable treatment to, and does not discriminate unfairly against, the class or classes rejecting it and otherwise satisfies the requirements of section 1129 of title 11 of the United States Code. **To have your vote count you must complete and return this Ballot, voting your entire claim to accept or reject the Plan, so that it is actually received by the Debtor's counsel on or before _____, 2011 at 4:00 p.m. (Prevailing Central Standard Time). Unsigned Ballots will not be counted.**

The proponents of the Plan have requested that the Bankruptcy Court adopt a presumption that if no holder of a Claim or Equity Interest in a Class of Claims or Equity Interests eligible to vote in a particular Class timely submits a ballot to accept or reject the Plan, then the applicable Class will be deemed to have accepted the Plan. Accordingly, if you do not wish such a presumption with respect to any Class for which you hold Claims or Equity Interests to become effective, you should timely submit a ballot accepting or rejecting the Plan for any such Class.

This Ballot is for voting purposes only and does not constitute and shall not be deemed a proof of claim or interest or an admission by the Debtor or any other party in interest of the validity of a claim or interest.

**IF YOU HAVE ANY QUESTIONS CONCERNING THE DISCLOSURE STATEMENT, THE PLAN, THIS BALLOT OR THE SOLICITATION AND VOTING PROCEDURES, OR IF YOU NEED A BALLOT OR ADDITIONAL COPIES OF ANY ENCLOSED MATERIALS, PLEASE CONTACT DEBTOR'S COUNSEL AT (612) 335-1500.**

**[This page intentionally left blank.]**

# Item 1:  Voting Classification and Amount

The undersigned is a holder of a Class _____ _____ Claim (as defined in the Plan) against the Debtors for the amount set forth below for voting purposes.

*Voting Amount: $*_____

# Item 2:  Vote

The undersigned votes the above-listed Class _____ _____ Claim:

(check one box):

☐ Accept the Plan          ☐ Reject the Plan

Name of Creditor: _____
(Print or Type)

By: _____
(Signature of Creditor or Authorized Agent)

Printed Name of Signatory: _____

Title: _____
(If Appropriate)

Street Address: _____

_____
(City, State and Zip Code)

Telephone Number: (_____)_____

Date Completed: _____

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

PFG ASPENWALK, LLC,

    Debtor.

Chapter 11
Case No. 10-47089-RJK

## BALLOT FOR ACCEPTING OR REJECTING THE
## CHAPTER 11 PLAN OF REORGANIZATION

### CLASS _____: EQUITY INTERESTS

**HOLDERS OF CLASS _____ EQUITY INTERESTS: YOUR BALLOT MUST BE RECEIVED BY COUNSEL FOR THE DEBTOR BY 4:00 P.M. (PREVAILING CENTRAL STANDARD TIME) ON _____, 2011, THE VOTING DEADLINE, OR YOUR VOTE WILL NOT BE COUNTED.**

   This is a ballot for the below-listed equity interest to vote to accept or reject the Chapter 11 Plan of Reorganization (the "Plan") for PFG AspenWalk, LLC (the "Debtor") filed by the Debtor. If you have more than one claim and/or equity interest entitled to vote in any Class, you will receive an additional ballot(s) on which to cast your vote.

PLEASE READ THIS ENTIRE BALLOT BEFORE COMPLETING. PLEASE COMPLETE, DATE, AND SIGN THIS BALLOT AND RETURN IT IN THE ENCLOSED PREADDRESSED, POSTAGE PREPAID ENVELOPE OR BY FIRST CLASS MAIL, OVERNIGHT COURIER OR HAND DELIVERY TO COUNSEL FOR THE DEBTOR. THIS BALLOT **MUST BE ACTUALLY RECEIVED** BY DEBTOR'S COUNSEL ON OR BEFORE _____, **2011 at 4:00 p.m. (prevailing Central Standard Time)**.

## PLEASE READ THE FOLLOWING BEFORE COMPLETING YOUR BALLOT

This Ballot is submitted to you to solicit your vote to accept the Plan, which is described in the disclosure statement in support of the Plan (the "Disclosure Statement"). A copy of the Plan was filed separately with the Bankruptcy Court and enclosed with the Disclosure Statement. The United States Bankruptcy Court for the District of Minnesota (the "Bankruptcy Court") approved the Disclosure Statement by order dated _____, 2011 (the "Disclosure Statement Order"). The Disclosure Statement provides information to assist you in deciding whether to accept or reject the Plan. A copy of the Disclosure Statement is contained in the package accompanying this Ballot. If you did not receive a hard copy of the Plan and Disclosure Statement, you may obtain one by contacting the Debtor's counsel, Robert T. Kugler and Lara O. Glaesman, Leonard, Street and Deinard Professional Association, 150 South Fifth Street, Suite 2300, Minneapolis, Minnesota 55402.

Please complete, sign and date this Ballot and return it to Debtor's counsel at Leonard, Street and Deinard Professional Association, Attention: Robert T. Kugler and Lara O. Glaesman, 150 South Fifth Street, Suite 2300, Minneapolis, Minnesota 55402 in the enclosed preaddressed, postage prepaid envelope or (ii) if by hand delivery or overnight courier to the same address listed above. **If your Ballot is not ACTUALLY RECEIVED by _____, 2011 at 4:00 p.m. (Prevailing Central Standard Time), it will not be counted. Ballots transmitted by facsimile, telecopy transmission or electronic mail will not be accepted and will not be counted as a vote to accept or reject the Plan.**

On _____, 2011, the Bankruptcy Court also approved certain procedures for the solicitation (the "Solicitation and Voting Procedures") and tabulation (the "Tabulation Procedures") of votes to accept or reject the Plan. The Solicitation and Voting Procedures and the Tabulation Procedures are set forth in the Disclosure Statement Order that accompanies this Ballot.

**By signing this Ballot, you make the following certifications:**

- "I have received or obtained a copy of the Disclosure Statement and the exhibits thereto, including the Plan."

- "I understand that, if this Ballot is validly executed and returned without checking a box to ACCEPT or REJECT, this Ballot will not be counted."

- "I have the full power and authority to vote to accept or reject the Plan on behalf of the claimant listed herein."

The Plan can be confirmed by the Bankruptcy Court and thereby made binding on you if it is accepted by the holders of at least two-thirds in amount and more than one-half in number of the allowed claims in each Class of claims voting on the Plan. In the event the requisite acceptances are not obtained, the Bankruptcy Court may nevertheless confirm the Plan if the Bankruptcy Court finds that the Plan provides fair and equitable treatment to, and does not discriminate unfairly against, the class or classes rejecting it and otherwise satisfies the requirements of section 1129 of title 11 of the United States Code. **To have your vote count you must complete and return this Ballot, voting your entire equity interest to accept or reject the Plan, so that it is actually received by the Debtor's counsel on or before _____, 2011 at 4:00 p.m. (Prevailing Central Standard Time). Unsigned Ballots will not be counted.**

The proponents of the Plan have requested that the Bankruptcy Court adopt a presumption that if no holder of a Claim or Equity Interest in a Class of Claims or Equity Interests eligible to vote in a particular Class timely submits a ballot to accept or reject the Plan, then the applicable Class will be deemed to have accepted the Plan. Accordingly, if you do not wish such a presumption with respect to any Class for which you hold Claims or Equity Interests to become effective, you should timely submit a ballot accepting or rejecting the Plan for any such Class.

This Ballot is for voting purposes only and does not constitute and shall not be deemed a proof of claim or interest or an admission by the Debtor or any other party in interest of the validity of a claim or equity interest.

**IF YOU HAVE ANY QUESTIONS CONCERNING THE DISCLOSURE STATEMENT, THE PLAN, THIS BALLOT OR THE SOLICITATION AND VOTING PROCEDURES, OR IF YOU NEED A BALLOT OR ADDITIONAL COPIES OF ANY ENCLOSED MATERIALS, PLEASE CONTACT DEBTOR'S COUNSEL AT (612) 335-1500.**

**[This page intentionally left blank.]**

## Item 1:  Voting Classification and Amount

The undersigned is a holder of a Class _____: Equity Interest (as defined in the Plan) against the Debtors for the amount set forth below for voting purposes.

*Voting Amount: $_____*

## Item 2:  Vote

The undersigned votes the above-listed Class _____ : Equity Interest:

(check one box):

☐ Accept the Plan        ☐ Reject the Plan

Name of Creditor: _____
(Print or Type)

By: _____
(Signature of Creditor or Authorized Agent)

Printed Name of Signatory: _____

Title: _____
(If Appropriate)

Street Address: _____

_____
(City, State and Zip Code)

Telephone Number: (_____)_____

Date Completed: _____

**<u>EXHIBIT C TO DISCLOSURE STATEMENT</u>**
**EXECUTORY CONTRACTS**

**See Attached**

7508068v1

| Executory Contracts and Unexpired Leases[1] | | | |
|---|---|---|---|
| *Contract* | *Party to Contract* | *Debtor's Intention Regarding Contract* | *Cure Amount, If Applicable* |
| Joint Development Agreement | Aspen Pitkin Housing Authority | Assume | $0.00 |
| Purchase Agreement for 414 Park Circle | Aspen Pitkin Housing Authority | Assume | $0.00 |
| Property Management Agreement | Sheridan Real Estate, LLC | Assume | $0.00 |
| 404 Park Avenue Lease Unit #0 | Julie Cook | Assume | $0.00 |
| 404 Park Avenue Lease Unit #1 | Brittany Buffalino | Assume | $0.00 |
| 404 Park Avenue Lease Unit #2 | Clayton Day | Assume | $0.00 |
| 404 Park Avenue Lease Unit #3 | Michael Falco/ Rustam Zynarglgopov | Assume | $0.00 |
| 404 Park Avenue Lease Unit #4 | Gavin Merlino/ Mary Kelley Kearney | Assume | $0.00 |
| 404 Park Avenue Lease Unit #5 | Esther Guillen | Assume | $0.00 |
| 404 Park Avenue Lease Unit #6a | Laurence Monji | Assume | $0.00 |
| 404 Park Avenue Lease Unit #8 | Rustam Zynarglgopov | Assume | $0.00 |
| 404 Park Avenue Lease Unit #9 | Cameron Leonard | Assume | $0.00 |
| 404 Park Avenue Lease Unit #10 | Michael Falco | Assume | $0.00 |
| 404 Park Avenue Lease Unit #11 | Manuel Noriega | Assume | $0.00 |
| 404 Park Avenue Lease Unit #12 | Shaun Healy | Assume | $0.00 |

[1] Please note that the Debtor may file any amendments to this list up until twenty (20) days prior to confirmation of the Plan.

**<u>EXHIBIT D TO DISCLOSURE STATEMENT</u>**
**PROJECTIONS**

**See Attached**

7508068v1

PFG ASPENWALK, LLC
Cash Flow Projection

_Rental Operation_

| | Mar. 2011 | Apr. 2011 | May 2011 | Jun. 2011 | Jul. 2011 | Aug. 2011 | Sept. 2011 | Oct. 2011 | Nov. 2011 | Dec. 2011 | Jan. 2012 | Feb. 2012 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Rental Revenue (1) | $ 13,446 | $ 13,446 | $ 10,250 | $ 10,250 | $ 10,250 | $ 10,250 | $ 10,250 | $ 13,446 | $ 13,446 | $ 13,446 | $ 13,446 | $ 13,446 |
| Vending Revenue (2) | $  - | $  - | $  - | $  - | $  - | $ 565 | $  - | $  - | $  - | $  - | $  - | $ 565 |
| | $ 13,446 | $ 13,446 | $ 10,250 | $ 10,250 | $ 10,250 | $ 10,815 | $ 10,250 | $ 13,446 | $ 13,446 | $ 13,446 | $ 13,446 | $ 14,011 |
| Cleaning & Maintenance (3) | $ (995) | $ (995) | $ (995) | $ (995) | $ (995) | $ (995) | $ (995) | $ (995) | $ (995) | $ (995) | $ (995) | $ (995) |
| Management Fee (4) | $ (2,750) | $ (2,750) | $ (2,750) | $ (2,750) | $ (2,750) | $ (2,750) | $ (2,750) | $ (2,750) | $ (2,750) | $ (2,750) | $ (2,750) | $ (2,750) |
| Cap. Expenditures/Repairs (3) | $ (1,000) | $ (1,000) | $ (1,000) | $ (1,000) | $ (1,000) | $ (1,000) | $ (1,000) | $ (1,000) | $ (1,000) | $ (1,000) | $ (1,000) | $ (1,000) |
| Insurance (5) | $ (895) | $ (895) | $ (895) | $ (895) | $ (895) | $ (895) | $ (895) | $ (895) | $ (895) | $ (895) | $ (895) | $ (895) |
| Taxes (6) | $  - | $  - | $  - | $  - | $  - | $  - | $  - | $  - | $  - | $  - | $  - | $ (17,608) |
| Utilities (3) | $ (2,200) | $ (2,200) | $ (2,200) | $ (2,200) | $ (2,200) | $ (2,200) | $ (2,200) | $ (2,200) | $ (2,200) | $ (2,200) | $ (2,200) | $ (2,200) |
| | $ (7,840) | $ (7,840) | $ (7,840) | $ (7,840) | $ (7,840) | $ (7,840) | $ (7,840) | $ (7,840) | $ (7,840) | $ (7,840) | $ (7,840) | $ (25,448) |
| Rental Operation Operating Profit (Loss) | $ 5,606 | $ 5,606 | $ 2,410 | $ 2,410 | $ 2,410 | $ 2,975 | $ 2,410 | $ 5,606 | $ 5,606 | $ 5,606 | $ 5,606 | $ (11,437) |

(1) March and April represent March cash receipts, May to August represent Aug. 2009 receipts. Decline due to seasonality
(2) Consists of washer/dryer revenue. Amount represents 50% of 2009 actual.
(3) Represents Debtor's best estimate based on historical results and future considerations known at the time of this report.
(4) Represents monthly fee paid to property manager.
(5) Represents pro rata insurance premium from last policy year.
(6) 2011 taxes payable have been paid. 2012 taxes reflect 3% inflation

_Debtor In Possession Financing_

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Loan Proceeds from DIP Lender | $ 215,250 | $ 369,750 | $  - | - | $  - | $  - | |
| Achitectural / Engineering | $ (65,000) | $ (138,250) | $  - | - | $  - | $  - | |
| Planning Consultant | $ (20,000) | $ (15,000) | $  - | - | $  - | $  - | |
| Local Project Management | $  - | $ (5,000) | $  - | - | $  - | $  - | |
| Travel and Misc. | $  - | $ (7,000) | $  - | - | $  - | $  - | |
| Legal | $ (50,000) | $ (50,000) | $  - | - | $  - | $  - | |
| Developer Overhead | $ (40,000) | $ (40,000) | $  - | - | $  - | $  - | |
| City Fees/Costs | $  - | $ (14,500) | $  - | - | $  - | $  - | |
| Closing Costs for Project Recap / Chap 11 filing | $  - | $  - | $  - | - | $  - | $  - | |
| Lender Points/Fees | $  - | $  - | $  - | - | $  - | $  - | |
| Contingency (Chap 11/addl. approval. costs, etc.) | $ (40,250) | $ (100,000) | $  - | - | $  - | $  - | |
| Total | $  - | $  - | $  - | - | $  - | $  - | |

**EXHIBIT E TO DISCLOSURE STATEMENT**
**LIQUIDATION ANALYSIS**


**See Attached**

7508068v1

| | | | | |
|---|---|---|---|---:|
| Rapid Funding | | | $ | 1,250,000 |
| | | | | |
| B of A | 1st Mtge | | $ | 4,080,000 |
| | Swap | | $ | - |
| | | | | |
| Security Deposits | | | $ | - |
| Pre-Petition Trade A/P | | | $ | - |
| | | | | |
| Salmen/Klassen Admin. Claim | | | $ | - |
| Legal and other Admin. Claims | | | | |
| | | | | |
| Closing Costs/Fees associated with New Financing | | | $ | - |
| | | | | |
| | | | | |
| Subtotal | | | $ | 5,330,000 |

| Common Unit Holders | Units | % of Common | | |
|---|---:|---:|---|---:|
| Tom Hay (President) | 161,917 | 16.2% | $ | - |
| Tom Klassen (VP Operations) | 17,991 | 1.8% | $ | - |
| Tom Salmen (VP Finance) | 17,991 | 1.8% | $ | - |
| Falcon Partners LTD | 110,308 | 11.0% | $ | - |
| Patricia Hamm | 20,056 | 2.0% | $ | - |
| Graham O. King Family LLC | 100,280 | 10.0% | $ | - |
| Jedco Properties LLC | 100,280 | 10.0% | $ | - |
| Mary Jeffries | 10,028 | 1.0% | $ | - |
| Lancer Partners LLC | 100,280 | 10.0% | $ | - |
| Jane Mauer | 50,140 | 5.0% | $ | - |
| Mark Laumann | 5,014 | 0.5% | $ | - |
| Ark Royal Aspen Realty, LLC | 195,546 | 19.6% | $ | - |
| Sun Investments LLC | 60,168 | 6.0% | $ | - |
| Rapid Funding | 50,000 | 5.0% | $ | - |
| Total | 1,000,000 | 100.0% | | |

| | | |
|---|---|---:|
| Value per 2009 appraisal of 404 Park Ave. for Petters Group Receiver | $ | 5,330,000 |